RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0270p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ESTATE OF WILLIAM J. BING, through its
Administrator Thomas E. Bing; BRIAN BING,
through Administrator Thomas E. Bing,
　　　　　　　　　　　*Plaintiffs-Appellees,*

　　　　v.

CITY OF WHITEHALL, OHIO; WHITEHALL POLICE
DEPARTMENT,
　　　　　　　　　　　*Defendants,*

MARK SHOWALTER, et al.,
　　　　　　　　　　　*Defendants-Appellants.*

No. 05-3889

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 03-00510—Algenon L. Marbley, District Judge.

Argued: April 27, 2006

Decided and Filed: August 1, 2006

Before: SUHRHEINRICH, GILMAN, and ROGERS, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Mark D. Landes, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, for Appellants. Linda Leah Reibel, Worthington, Ohio, for Appellees. **ON BRIEF:** Mark D. Landes, Jeffrey A. Stankunas, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, for Appellants. Linda Leah Reibel, Worthington, Ohio, for Appellees.

ROGERS, J., delivered the opinion of the court in which, SUHRHEINRICH, J., joined. GILMAN, J. (pp. 15-16), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

ROGERS, Circuit Judge. This is an interlocutory appeal seeking reversal of the district court's summary judgment order denying qualified immunity to the defendant police officers. We reverse in part and affirm in part.

On the evening in question, decedent William Bing fired a gun into the air and into the ground near his home, which prompted witnesses to telephone the Whitehall police. Upon arriving at the scene, the police learned from witnesses that Bing had retreated into his home. The police, backed up by the S.W.A.T. team, surrounded Bing's house, attempted to communicate with Bing, and subsequently tried to force him outside using pepper gas. Eventually, the S.W.A.T. team invaded the house and killed Bing. During the raid, the police employed a flashbang device that burned the house down.

Bing's estate and his brother Brian brought this suit under the Fourth and Fourteenth Amendments, 42 U.S.C. §§ 1983, 1986, 1988, and state law against the City of Whitehall, the police department, and various individual police officers. The claims relevant to this interlocutory appeal allege that the police officers violated Bing's clearly established rights when they entered his home without a warrant, used excessive force by employing pepper gas and flashbang devices, unreasonably used deadly force when they shot and killed him, and unreasonably destroyed property when they burned down the house. The district court denied the officers' motion for summary judgment on the basis of qualified immunity because genuine issues of material fact exist and require that a trial be held. This interlocutory appeal followed.

We reverse in part. The officers lawfully effected a de facto house arrest of Bing when they surrounded his house, despite not obtaining a warrant, because Bing's firing of shots in the neighborhood, among other circumstances, created a dangerous exigency. For the same reason, the police did not need to obtain a warrant before entering the house. Moreover, the police reasonably employed pepper gas and a flashbang device in their attempt to force him outside. Assuming that the police's use of a second flashbang device that set Bing's house on fire violated his constitutional right to be free from excessive force, the right in this context was not "clearly established." However, the district court properly denied summary judgment with respect to the claim of deadly force with regard to the shooting of Bing. If, as the district court posited, Bing was unarmed after the police entered the home and did not threaten them in any manner as they approached, the officers violated his clearly established right not to be attacked with deadly force. The officers, therefore, enjoy no immunity from the police-shooting deadly force claim, and summary judgment was properly denied as to that claim.

**I.**

On October 14, 2002, sometime in the evening, William Bing fired his gun into the ground and into the air to frighten away from his property a group of minors who had been taunting him. Around 6:30 p.m., Whitehall police arrived in Bing's neighborhood, responding to reports of shots fired in the neighborhood. The initial report, as heard over the police radio, said that a juvenile wearing red clothing had fired a weapon. The police went to Bing's neighborhood to investigate. People in the street, including a group of juveniles, directed Officers Salyers and Adkins to Bing's house. A crowd was gathered in front of Bing's house. The people in the street told the police that the reported gunman was inside the house and armed. The minors in the street reported to Detective Grebb that Bing had shot at them. Other neighbors called the police to complain about Bing after the initial report of shots fired.

The officers set up a perimeter around Bing's house within minutes. The people in the street informed Officer Salyers that the reported gunman appeared intoxicated and that he had come out of the house, fired a shot,[1] and returned into the house. Officer Salyers subsequently retrieved his shotgun from his police car "[f]or protection" and took up a position nearby. Officer Salyers took

---

[1] According to the complaint, however, Bing fired two shots, one into the air and another into the ground.

out his shotgun, he said in his deposition, because he felt that his life was potentially in danger, given the report of shots fired.

Fearing for the community's safety, the police instructed Bing's neighbors to evacuate their homes, but the neighbors refused. The presence of the neighbors increased the police's level of concern. In an attempt to contact Bing, the police had the police dispatcher call Bing's telephone. The initial attempt at making contact with Bing via phone was meant, according to one policeman, to get "him to come out of the residence so we could talk about what happened." Bing's phone line was busy.

Around the same time, the police checked to see if they had been to Bing's residence before. The officers learned that police had been called to Bing's residence in the past and that he had fired shots in the past. Officer Salyers in his deposition said of this new information: "It definitely change[d] the assessment. It [told] us that there [were] definitely weapons in the house and that [Bing] has used them in the past." The perceived danger of the situation prompted the officers to decide not to go in immediately, according to Officer Salyers. "That's common sense. You don't go running into a house where somebody's shooting."

Through the windows, Officer Salyers could see Bing moving from room to room. Officer Salyers yelled at Bing to leave his gun in the house and walk out to the driveway with his hands in the air. Bing ignored Officer Salyers, but Salyers continued for about twenty minutes to shout his demand that Bing surrender. According to the officers' depositions, it was their intent to arrest Bing the moment he came out of his house. When Bing refused to come out, Sgt. Allen decided that they would have to take more extraordinary measures: he called in the S.W.A.T. team.

The S.W.A.T. team arrived at the scene, according to Sgt. Brandeberry, its commander, at approximately 7:30 p.m., about an hour after the first officers arrived. Officer Salyers left the scene, changed into his S.W.A.T. gear, and returned before 8:30 p.m. Approximately eleven team members ultimately responded. The S.W.A.T. team set up a command center about nine houses up from Bing's residence. Sgt. Brandeberry remained at the command center with the hostage negotiators, Lieutenant Zitsky, Hostage Negotiator Forbes, and Officer Showalter.

In his deposition, Sgt. Brandeberry stated that the "first thing" he did upon arriving at the command center was "[a]ttempt[] to gather intelligence from the perimeter patrol officers as to what they had, what had transpired thus far." The perimeter officers, apparently not relying on the initial police radio report, told Brandeberry that Bing had fired his weapon "at" neighborhood children. Sgt. Brandeberry also stated that he believed, from the moment of his arrival, that exigent circumstances made it unnecessary to seek a warrant. "[An] [a]rrest would certainly have been made had [Bing] made himself present for it." Sgt. Brandeberry said that he felt that there was a "possibility" of immediate danger to the people outside Bing's house. Bing "had show[n] his propensity to willfully shoot at individuals," he explained. The plaintiffs' lawyer and Sgt. Brandeberry had the following exchange during his deposition:

> Q.    . . . we're talking about maybe three and a half hours. In that period did you see any danger to others?
>
> A.    There is always that danger to others. He is an armed individual who has already fired shots at individuals.
>
> Q.    In this three and a half hour period that we're talking about what was your plan for Mr. Bing?

A.      It was my hope[] that he would either pick up the phone and talk to us or eventually the gas would bring him out or he may give up of his own volition.

Q.      So the plan was to arrest him.

A.      Yes, ma'am.

Q.      Based on the shot or shots fired, based on the original report the shots had been fired.

A.      Correct.

At about 8:43 p.m., the police broke one of Bing's windows with a special tool and threw into the house a "bag phone," a portable communication device with a microphone and a secure line between two receivers. The police rang the phone many times but Bing did not answer.

Around 8:54 p.m., Bing remained holed up and incommunicado, so the police decided to increase the pressure on him to leave the house by firing pepper gas into the house through the windows. The police proceeded to break the windows in Bing's house and fire six canisters of pepper gas into the residence.

Around 9:02 p.m., the police heard Bing coughing and gagging on the bag phone microphone. After the coughing, Bing came out the side door into the driveway under the carport. Bing retreated into the house and closed his door, however, when the officers approached him to effect an arrest. The police fired at least two more series of six gas canisters each, but the gas never forced Bing out of his house.

Between 9:30 p.m. and 9:45 p.m., Richard Finton, Bing's friend and Alcoholics Anonymous sponsor, tried to speak with Bing through a police cruiser's public-announcement system. Finton told Sgt. Brandeberry in private that Bing "was an alcoholic" who had been on a three- or four-day drinking binge, "that he had more than likely consumed narcotics of some sort, [and] that it was a possibility he was huffing some sort of inhalant." Finton also said that there was no chance that Bing would pass out, and that he had "several weapons in the house."

Sometime after using the first series of gas canisters, Sgt. Martin, a S.W.A.T. team leader, authorized the removal of Bing's door with a battering ram. Removing the front door permitted the police to shine a spotlight into the house so that they could see better what was happening inside. Around 10:20 p.m., Sgt. Brandeberry authorized the use of a flashbang device. Detective Grebb then used the flashbang near the bedroom window.

Bing allegedly responded to this first flashbang by firing a shot that the officers heard clearly. According to the officers, they did not know whether Bing had shot himself, at random, or at them. They consequently did not raid the house immediately but instead reinserted the bag phone at about 11:05 p.m., this time in the bedroom, after having removed it for a time. While reinserting the bag phone, Officer Salyers claims that he saw a bullet hole near the window and surmised from this fact that Bing had shot at them. Detective Grebb also saw the hole and surmised that Bing had shot at the officers.

After concluding that Bing had shot at them, the police decided to enter the house. A little before 11:20 p.m., the S.W.A.T. team raided Bing's house. Detective Grebb in his deposition explained the decision to raid the house as follows:

Q:      Did you talk to Sergeant Brandeberry at all about why you couldn't have just
        outwaited [Bing], maybe sat there all night?

A:      We would have done that had he not shot through the wall at the officers.
        . . . .

        As I explained, had he not been creating an immediate threat to the people of
        the neighborhood and outside of the house, he could have stayed in there all
        night. Once he started shooting, it changed the circumstances; and we
        reacted to what he did.

During the raid, the S.W.A.T. team members wore gas masks to protect themselves from the pepper gas lingering in the air. The team planned to use a flashbang device to disorient Bing and thereby provide cover to the invading officers. As a group of the officers including Sgt. Martin entered the house, Sgt. Martin saw a "ragged" hole in a door just ahead of them. In Sgt. Martin's telling, the hole was roughly the size of a fist, or about "3 to 5 inches." The hole was four-and-a-half to five feet "up on the door," according to Sgt. Martin. "I saw Mr. Bing look out in the hall" from the hole; "[t]hen quickly, he stuck a gun through the hole, fired a round, withdrew the gun, took the gun back up, fired a second round . . . ." In Officer Salyers' telling, the officers "started taking fire." According to Officer Salyers, Bing shot at the police through this hole in the wall. In response, Sgt. Martin fired his shotgun twice at the center of the door from a distance of about fifteen feet. When Bing fired at the police, Officer Salyers saw the muzzle flash from Bing's gun and dashed behind a protective shield held by Officer Dickey before firing several rounds at the door's center in response. According to the officers, these events transpired over a span of less than two minutes.

Upon hearing Bing's shots at Sgt. Martin and Officer Salyers within the house, Detective Grebb employed a flashbang device in an effort to distract Bing. The flashbang device ignited materials in the house, which instantly caught fire. The fire spread rapidly and the fire department arrived. But the police did not permit firefighters to enter Bing's house immediately because, according to the police, Bing might fire on them. Firemen entered the house only after the fire grew more intense and it became evident that a person inside could not pose a threat to the firefighters. One fireman found Bing's body inside the house and moved it, but stopped attempting to move the body after he realized that Bing was dead.

The Franklin County coroner's report lists the time of Bing's death as 11:42 p.m. The report also states that a shotgun blast to the back killed Bing. Bing also had at least one broken leg.

The plaintiffs are Bing's estate and his brother, Brian Bing. They brought this suit against the City of Whitehall, the police department, and the individual officers under 42 U.S.C. §§ 1983, 1986, 1988 and state law. The district court held that the defendant officers are not immune from suit under the doctrine of qualified immunity because a trial is needed to resolve the parties' various factual disputes. Regarding the plaintiffs' § 1983 claim for warrantless entry, the district court held that the alleged facts permitted the inference that the police violated Bing's rights twice: first, when they broke Bing's windows and battered in his door; and second, when S.W.A.T. fireteams invaded his home.

With respect to the breaking of Bing's windows and door, the district court held that a rational juror could conclude that no exigency existed. The officers did not agree in their accounts about whether Bing had shot *at* the neighborhood teenagers or had shot his gun while aiming at no one in particular. This disagreement implied that a rational juror could disbelieve that Bing posed an immediate danger, the district court observed. Detective Grebb implied in his testimony that Bing posed no immediate threat to others when he said that the police would not have invaded his

house had he not fired at them. The police, the district court also noted, did not face an exigency because they waited about two hours before this first "entry."

Regarding the S.W.A.T. team's warrantless entry into the house during the raid, the district court held that a genuine dispute existed about whether Bing in fact shot at Detective Grebb. The district court expressed dissatisfaction with the amount of proof supplied by the police (i.e., Detective Grebb's testimony and a picture of the hole in the window frame). The district court said that Bing's gun "apparently contains none of Bing's fingerprints," and implied that the paucity of evidence supplied by the defense should be enough to allow the issue to reach a jury because Bing is dead and cannot rebut the police version of events, thereby causing much of this case to turn on police credibility.

The district court also held that genuine disputes over issues of material fact precluded summary judgment on the plaintiffs' § 1983 deadly force claim. The district court determined that a jury should decide whether Bing shot at the officers first, as the officers claim. The district court again said that the "gun allegedly used to shoot at the SWAT team did not contain Bing's fingerprints." The district court also relied on a letter submitted by the plaintiffs' expert witness, Larry Dehus, which stated that Bing's body positioning was inconsistent with the officers' story and that the autopsy report "does not indicate" when Bing's leg was broken. The district court applied a "heightened scrutiny of sorts." The district court found that a genuine dispute existed in light of "the lack of physical evidence supporting Defendants' version of events." The district court viewed the issue as one of police credibility.

The district court also held that genuinely disputed issues of material fact precluded summary judgment on the plaintiffs' § 1983 excessive force claims regarding the police's use of pepper gas and flash bangs. Whether such force was excessive depended on the severity of the initially reported incident involving Bing's firing of his weapon, Detective Grebb's knowledge (or lack thereof) that accelerants were present in the house, and whether Detective Grebb acted offensively when he threw the second flashbang towards Bing. The district court held that a jury, not a judge, should determine these material issues of fact.

The district court did not rule on whether any of the constitutional rights allegedly violated were "clearly established."

## II.

Reviewing de novo, we reverse the district court's order in part. The officers are immune from suit for the breaking of Bing's front door, the warrantless seizure of Bing via encirclement of the house, the use of pepper gas and flashbang devices, the warrantless entry into Bing's house, and the destruction of Bing's home.

This court has jurisdiction over this appeal because a district court's order denying qualified immunity may be appealed immediately. *See Mitchell v. Forsyth*, 472 U.S. 511, 524-30 (1985). But "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). In this interlocutory appeal this court may review only "purely" legal arguments. *Smith v. Cupp*, 430 F.3d 766, 772 (6th Cir. 2005). The plaintiffs bear the burden to prove that the officers are not shielded by qualified immunity. *See Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999).

## A.

The police did not violate Bing's Fourth Amendment rights when they effected a warrantless house arrest by encircling the house and otherwise controlling his movements through the use of pepper gas. A warrant authorizing these actions was unnecessary because Bing's behavior created a dangerous exigency.

The district court saw the siege and its methods, such as the use of the pepper gas, the breaking of the door, and the breaking of the windows, as a first set of "entries" into the home requiring a warrant. We need not decide whether this activity constitutes "entry" for Fourth Amendment purposes because a warrant authorizing it was just as much required, absent exigent circumstances, on other grounds. By laying siege to Bing's house, breaking his door and windows, and employing pepper gas, the police accomplished a de facto house arrest, i.e., a Fourth Amendment seizure. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 506-07 (6th Cir. 2002). In *Ewolski* this court held that the use of police coercion to exercise physical control over an armed, barricaded suspect while he is inside his home amounts to a Fourth Amendment seizure, *id.*, and exactly this occurred in this case.

### 1.

The police were not however required to get a warrant before completing this de facto house arrest because Bing posed an immediate threat of serious injury to the police and the people in the street. As we stated in *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989), exigent circumstances exist when an immediate and serious threat to the safety of the police or the public is present. A "person may not be arrested at home without a warrant, regardless of the existence of probable cause, absent exigent circumstances." *United States v. Bradley*, 922 F.2d 1290, 1293 (6th Cir. 1991), *overruled on other grounds by United States v. McGlocklin*, 8 F.3d 1037, 1047 (6th Cir. 1993) (en banc).

The following facts, not held to be the subject of a genuine dispute, support the conclusion that a dangerous exigency justified the house arrest of Bing: (1) Bing discharged a firearm near neighborhood minors; (2) Bing continued to have access to a gun inside the house; (3) the police had been called to Bing's residence on previous occasions because he previously had fired shots; (4) the police could see Bing move from room to room, demonstrating that police and bystanders were probably within range of Bing's gun; (5) people in the street reported that Bing appeared intoxicated, making it reasonable to expect that he would act unstably; (6) a crowd was gathered in the street near Bing's house, and people in the neighborhood refused to evacuate. In other words, Bing had shown a willingness to fire weapons in his neighborhood and could have harmed others in an instant with little effort. Therefore, a dangerous exigency existed. As we stated in *Causey v. City of Bay City*, 442 F.3d 524, 529 (6th Cir. 2006), "an exigency exists when officers can demonstrate that a suspect has a willingness to use a weapon" (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1159-60 (6th Cir. 1996)).

This conclusion finds support in *Hancock v. Dodgson*, 958 F.2d 1367 (6th Cir. 1992), a case where this court found exigent circumstances to enter a home without a warrant due to an immediate danger. The *Hancock* court cited the following determinative facts: (1) "the officers received a call over the police radio that there existed a situation involving a suicidal and possibly homicidal gunman"; (2) the police "dispatch reported that shots had been fired"; (3) at least one radio communication indicated that the suspect had threatened to kill any approaching officer; (4) upon arriving at the house where the suspect was located, the police saw a .22 caliber gun next to the front door; (5) the suspect was standing on the front porch; (6) the police could not tell whether the suspect

was armed. *Id.* at 1375-76. On these facts, this court held that an immediate-danger exigency justified warrantless entry into the house. *See id.*

If an immediate-danger exigency existed in *Hancock*, a fortiori a dangerous exigency existed here. In this case, as in *Hancock*, the police received a report of shots fired. Here, as in *Hancock*, the police had information indicating that Bing could be homicidal. Bing had fired shots in the presence of minors, making it reasonable to expect that Bing could become homicidal. In this case, as in *Hancock*, the suspect had access to a gun.

But the facts here make the case for a dangerous exigency stronger than in *Hancock*. The police in *Hancock* did not have to worry about the safety of bystanders or neighbors. There was no indication that the suspect was intoxicated, and the police had not been to the *Hancock* suspect's house previously due to his firing of shots. Also, the police in *Hancock* did not even know the nature of the threat that the suspect posed—their entry was justified precisely because they needed to find out. *See id.* ("Shrah decided to go through the house because it was the quickest route to get to the suspect *to determine the extent of the threat which he posed.* Under these circumstances, the officers were truly faced with an emergency situation, and were entitled to enter the house without a warrant.") (emphasis added). Here, on the other hand, the police had already ascertained that Bing posed a danger to identifiable people based on his firing of shots and the presence of his neighbors and the people in the street. It is true that in *Hancock* the police received a report of a threat of violence against the police, while Bing issued no comparable threat. But the safety of neighbors nearby, the increased risk of unstable behavior due to intoxication, and Bing's history of firing shots far outweigh the lack of one reported threat. Under *Hancock*, the police in this case faced an immediate-danger exigency.

Moreover, that exigency did not terminate due to the passage of time or the police's actions. First, the exigency did not terminate due to the passage of time because Bing was at all times dangerous. Roughly two hours and twenty-four minutes passed from the time the police arrived at about 6:30 p.m. until they used the gas canisters at 8:54 p.m., but the passage of this much time did not itself terminate the exigency. The passage of time did not terminate the exigency because the ticking of the clock did nothing to cut off Bing's access to his gun, or cure him of his willingness to fire it, or move to safety the people nearby who refused to evacuate. In *United States v. Lindsey*, 877 F.2d 777, 782 (9th Cir. 1989), the Ninth Circuit held that a delay of one hour did not dissipate an exigency. "The source remained in possession of dangerous explosives and may have grown increasingly suspicious of police intervention." *Id.* Exigent circumstances terminate when the factors creating the exigency are negated. *See, e.g., Mincey v. Arizona*, 437 U.S. 385, 393 (1978); *see also Causey*, 442 F.3d at 530; *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994). Because the passage of time did not make Bing any less dangerous, Bing posed a continuous immediate danger. *Cf. Michigan v. Tyler*, 436 U.S. 499, 510 (1978) (permitting, under the exigency exception to the warrant requirement, warrantless searches in fire investigations to detect "continuing dangers" such as defective furnaces or faulty wiring that could cause fire). Consequently, the two and a half-hour passage of time did not by itself negate the dangerous exigency in this case.

Second, no factors other than the mere passage of time—such as the officers' decision to wait for backup, gather perimeter reports, or execute a plan—negated the exigency. The police waited for backup from about 6:30 p.m., when they first arrived, until around 7:30 p.m., when the S.W.A.T. arrived. Thus, about an hour passed while the officers waited for backup. Another hour and twenty-four minutes, approximately, passed before the employment of the gas at 8:54 p.m. During this period, the police gathered reports from the officers stationed along the perimeter, developed a plan for dealing with Bing, including the use of pepper gas and the bag phone, and executed that plan. The police's decisions to wait for backup for an hour and to gather intelligence and execute a plan for another hour and twenty-four minutes did not terminate the exigency.

This court's precedents and persuasive authority from other circuits leave no doubt that an exigency does not terminate merely because the police wait for backup, or because they take the time reasonably necessary to confirm information and execute a plan. As this court noted in *Causey*, "waiting half an hour or less for backup does not mean that there was no [immediate-danger] exigency." 442 F.3d at 531. In *Dickerson*, also, this court found imminent peril even though the first officer on the scene waited for backup, although we did not mention how long that officer waited. *See* 101 F.3d at 1154, 1160. The wait in this case for specialized backup with sophisticated S.W.A.T. team equipment should be expected to take longer than waiting for one officer, as in *Dickerson*, *id.* at 1154, or a few "colleagues," as in *Causey*, 442 F.3d at 527. Waiting for one hour for the S.W.A.T. team here was reasonable and did not negate the exigency. *See Lindsey*, 877 F.2d at 781-82 (holding that a one-hour wait for reinforcements did not terminate the exigency).

Moreover, the on-the-scene investigation by the police did not terminate the exigency. *See Causey*, 442 F.3d at 526-27, 530. In *Causey*, this court held that a dangerous exigency was not terminated by a police investigation that included two witness interviews, conferral with dispatch, and a search of the suspect's yard. *Id.* Similarly, in this case, after arriving on the scene, the S.W.A.T. commander gathered intelligence from officers stationed along the perimeter around Bing's house for an unknown period of time. This information-gathering activity accounts for some of the "two-hour gap" that the district court cited when it held that a genuine issue of material fact on the issue of exigency precluded summary judgment. But the gathering of information by police, even in the face of immediate danger, does not negate a dangerous exigency. In *United States v. Picariello*, for instance, the First Circuit held that an F.B.I. investigation lasting five hours did not the terminate the danger-based exigency in that case. *See* 568 F.2d 222, 226 (1st Cir. 1978).

Finally, the police's execution of a plan for dealing with a dangerous exigency did not terminate the exigency. The S.W.A.T. team's execution of the plan to employ the gas, although it took roughly one hour and twenty-four minutes from the time of their arrival, was not unduly delayed and the exigency consequently did not terminate merely because the plan consumed that quantity of time. The police in this case gathered information from the officers around the perimeter and then exhausted alternatives, such as the attempt to contact Bing via the bag phone. Only then did the police resort to the use of pepper gas. The police's incremental increase in the amount of pressure on Bing was methodical, planned, and professional.

This court has never held that only plans of action requiring brief windows of time may stay within the scope of a dangerous exigency. By contrast, other courts have countenanced time-consuming courses of action. The Eighth Circuit in *United States v. Jones*, 635 F.2d 1357, 1361-62 (8th Cir. 1980), held that "careful police work" that lasted an hour did not terminate the danger-based exigency. Similarly, the Fifth Circuit in *United States v. De Jesus-Batres*, 410 F.3d 154, 158-59 (5th Cir. 2005), held that police officers' forty-five minute search of a house did not terminate the dangerous exigency that justified the subsequent, warrantless search of the nearby garage. Therefore, the exigency was not terminated by the police decision to plan and execute the pepper gas employment in a proper fashion after exhausting alternatives.

The district court held that a factual dispute precluded summary judgment on the issue of whether a dangerous exigency existed to justify shooting pepper gas into the house without a warrant. The district court relied on the following quote from the deposition of Sgt. Martin to support its conclusion:

Q:      Did you talk to Sergeant Brandeberry at all about why you couldn't have just outwaited him, maybe sat there all night?

A:      We would have done that had he not shot through the wall at the officers. . . . .

> As I explained, had he not been creating an immediate threat to the people of
> the neighborhood and outside of the house, he could have stayed in there all
> night. Once he started shooting, it changed the circumstances; and we reacted
> to what he did.

Pointing to Sgt. Martin's statement that Bing did not pose a danger until later in the evening when he allegedly shot at the police (an allegation that the district court held was genuinely disputed for summary judgment purposes), the district court held that a rational juror could find that the officers did not reasonably believe that a dangerous exigency justified the decision not to obtain a warrant.

Sgt. Martin's statement, however, did not raise the legal floor for establishing a dangerous exigency. Sgt. Martin explains in this quote why the S.W.A.T. team decided *to raid the house*. In saying that there was no immediate danger before the raid, he plainly said that the danger was not severe enough *to justify a raid*.

It cannot be that an immediate-danger exigency could have existed only when the police reasonably felt forced to raid the house. If this standard were generally applicable, any time the police methodically increase the pressure on a barricaded gunman to force his exit, without invading, a rational juror may on that basis find no immediate danger. This position is not compelled by the Fourth Amendment. The extreme level of danger that requires police to mount an immediate invasion with weapons drawn cannot serve as the floor for establishing a dangerous exigency. "Immediate danger" cannot require "immediate invasion," no matter what one police officer's deposition says. The police in *Dickerson* and *Causey* did not mount immediate raids (and presumably felt no need to do so), but this court in those cases held that no rational juror could disagree that dangerous exigencies were present. Therefore, this quote from Sgt. Martin's deposition does not create a genuinely disputed issue of material fact on the issue of exigency.

This court's ruling in *O'Brien v. City of Grand Rapids*, 23 F.3d 990 (6th Cir. 1994), is not to the contrary. In *O'Brien*, a search case, this court held that no exigency existed where the police encircled the house of an armed man who had yelled at police to get off his property and then retreated into his house for six hours without violent incident. *Id.* at 993-94, 997-98. The police in *O'Brien* were assisting in the seizure of Joseph O'Brien's truck from his property to satisfy a civil judgment. *See id.* at 993. One of the officers spotted O'Brien standing his doorway with a rifle in the port arms position. O'Brien disobeyed the officer's order to drop his weapon and yelled, "Leave my truck alone! Get out of here!" With that, O'Brien closed the front door. The officers called for backup, setup a perimeter, and evacuated the neighbors. The police tried to talk to O'Brien for nearly six hours but never informed him through the bullhorn or otherwise that he was under arrest. The police learned that O'Brien had mental problems and had been cleared of charges for violent actions in the past.

The police attempted to use investigatory "probes" to help them view what was happening in the house. *See id.* at 994. O'Brien eventually responded to this probing with gunfire. *See id.* At length the police shot and killed O'Brien. Police Chief Hegarty conceded that O'Brien presented "no overt physical, hostile threat at any time from 11:50 [a.m.], when he closed his door, until 5:56 [p.m.] when the shot was fired."

The *O'Brien* court held that no exigency based on immediate danger justified the officers' warrantless use of the search probes. *See id.* at 997-98. The court relied on the following facts to draw this conclusion: (1) from "the time O'Brien retreated into the house until just before the third probe, O'Brien had taken no action against the officers"; (2) O'Brien never pointed his gun at anyone during the relevant time period; (3) O'Brien did not verbally threaten to use his gun; and (4) the

officers delayed using the first probe for four-and-a-half hours. *Id.* Consequently, any threat from O'Brien was not "immediate" and therefore supplied no exigency. *See id.* at 997-98.

*O'Brien* is distinguishable from this case in relevant respects. Bing posed a much more immediate threat than did O'Brien. In this case, unlike *O'Brien*, police responded to a call of shots fired. Bing fired his weapon, while O'Brien never discharged his weapon during the relevant period. Unlike O'Brien, Bing had a history known to the police of firing shots in his neighborhood, and there is no report that Bing had been cleared of charges as O'Brien had. Here, innocent bystanders were in the street, where they might have been hit had Bing fired. In *O'Brien*, by contrast, the police successfully evacuated the neighbors, apparently leaving no bystanders outside the house that could have been hit by stray bullets. The police in this case did not delay as did the police in *O'Brien*. Here, the police waited an hour for backup, another hour or so to insert the bag phone (after gathering intelligence), and another eleven minutes to use the pepper gas for the first time. In *O'Brien* backup arrived in seconds, *see id.* at 993, but the police nevertheless waited four-and-a-half hours to position the first probe, *see id.* at 998, a clear case of procrastination having no parallel here. These material distinctions render *O'Brien*'s holding regarding the immediacy of danger inapplicable to this case.

Therefore, the dangerous exigency permitted the police to seize Bing by encircling his house and controlling his movements using pepper gas without obtaining a warrant.

**2.**

The police's warrantless entry into Bing's house around 11:20 p.m., like the de facto house arrest, was justified by the dangerous exigency created by Bing. The exigency that permitted the warrantless seizure of Bing through the use of pepper spray had not abated when they entered about one hour and thirty minutes later. *See Causey*, 442 F.3d at 530. Just before the police entered the house, Bing still had access to a gun. There were no grounds for concluding that Bing had lost the willingness to use it; moreover, the neighbors were still not evacuated. In short, the previous exigency continued. The officers therefore did not violate Bing's Fourth Amendment rights when they entered the house without a warrant.

**B.**

The police are also entitled to qualified immunity with respect to the plaintiffs' claims for excessive force in the use of pepper spray and flashbang devices, and for the destruction of property. The police used reasonable force when they employed pepper gas and the first flashbang device in an attempt to force Bing outside the house. Although a jury could conclude that the police used excessive force when they employed the second flashbang device, which set the house on fire, the right against this use of force was not "clearly established," entitling the officers to immunity from this claim as well. For the same reason, the plaintiffs' destruction of property claim based on the house fire is also barred by the officers' qualified immunity.

In a qualified immunity analysis, the "first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered on a more specific level." *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

**1.**

The police's use of pepper gas and the first flashbang device was reasonable under the totality of the circumstances test set forth in *Graham v. Connor*, 490 U.S. 386, 396 (1989). *Graham* requires this court to determine the reasonableness of the police use of gas and the flashbang devices by performing a "careful balancing of the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing governmental interests at stake."  *Id.* (internal quotation marks omitted).  When judging the objective reasonableness of a use of force, this court may not use 20/20 hindsight. *See id.* at 396-97.  The court must adopt the perspective of a reasonable policeman on the scene.  *See id.*  The court weighs Bing's interest in avoiding the officers' use of pepper gas and the first flashbang against the officers' interest in using these methods, as measured by the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Under *Graham*'s balancing test, the officers' use of pepper gas and the first flashbang were reasonable because their interest in employing these devices outweighed Bing's interest in avoiding them.  Bing of course has a significant interest in not having his house gassed, and in avoiding having a flashbang device explode in his home.  But the police's interest here outweighed Bing's interest because, as noted above regarding exigency, Bing posed a serious and immediate threat to others and refused to come out of his house to be arrested.  The police had a great need to disarm Bing and place him under arrest to abate the threat that he posed to people in the area.  This interest outweighed Bing's significant interest in avoiding this use of force.

**2.**

Nevertheless, when the officers employed the second flashbang device, at least under the district court's view of the facts, the officers violated Bing's right against excessive police force under the *Graham* balancing test.  Assuming that the officers knew that Bing's house contained highly flammable accelerants and that a flashbang device could easily start a fire, the use of such a device was on balance objectively unreasonable.  The district court assumed for summary judgment purposes that a jury could find that the police "knew or should have known that accelerants were present and would likely start a fire."[2]  Applying *Graham* to the district court's view of the facts, it is objectively unreasonable for the police to employ a flashbang device with full knowledge that it will "likely" ignite accelerants and cause a fire.  A fire, which in fact occurred, posed a mortal threat to Bing, who of course has a fundamental interest in his life.  *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

Although in theory the police might have had a great enough interest in seizing Bing to justify the use of deadly force, the *Graham* test is a totality of the circumstances test.  *See id.* at 317.  As such, it governs the *method* of force used as well as the *level* used.  *See, e.g., United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (holding that tackling was a reasonable method of effectuating a stop under the circumstances).  The government's interest in using various *methods* of applying similar levels of force may be weighed as a factor in the *Graham* analysis.  *See id.*  For example, if the police had a great enough interest to use deadly force against Bing, it does not follow that they may do so in any way they desire, say, by burning down his house rather than shooting at him.  The government necessarily had less of an interest in burning down Bing's house than it had in shooting at him because the police had no interest in creating the additional risk that a burning building poses to everyone else in the neighborhood.  Throwing a flashbang device into a house with knowledge that the dwelling will likely catch fire thus constitutes unreasonable force in these circumstances even assuming (without deciding) that the police would have been justified in using deadly force.

---

[2]In viewing the facts in the light least favorable to the movant, we accept this fact, notwithstanding evidence in the record that the "accelerants" were in fact cans of Sterno.  JA 330 (deposition testimony of Finton in which he states, "The only thing, or one of the things that [Bing] had been huffing lately that I knew of was Sterno.").

Bing's right not to endure a second flashbang device in these circumstances, however, was not "clearly established." The Supreme Court has not clearly established such a right, nor has this court or other circuits. *See Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991) (noting that this court first looks to Supreme Court cases, then to Sixth Circuit cases, and finally to decisions of other circuits). None of the cases concerning flashbang devices to which the parties refer involve policemen who knew that such devices would likely ignite flammable materials and thereby cause a fire. *See Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005); *Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003); *United States v. Dawkins*, 83 Fed. Appx. 48, 51 (6th Cir. 2003); *see also Boyd v. Benton County*, 374 F.3d 773, 778, 781-82 (9th Cir. 2004) (examining *United States v. Jones*, 214 F.3d 836 (7th Cir. 2000); *United States v. Myers*, 106 F.3d 936 (10th Cir. 1997); *United States v. Baker*, 16 F.3d 854 (8th Cir. 1994)).

Given the lack of any case similar to this case finding a Fourth Amendment violation, it would not have been clear to a reasonable officer in the circumstances at issue that employing the second flashbang device violated the Constitution. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The officers' actions fall near enough to the "hazy" border separating illegal from legal conduct for qualified immunity to attach. *See Brosseau v. Haugen*, 543 U.S. 194, 201 (2004); *Saucier*, 533 U.S. at 206. The officers are therefore immune from suit for the excessive force associated with the second flashbang. The same reasoning requires immunity for the destruction of Bing's house.

## III.

The district court however properly denied summary judgment in favor of the officers with respect to the plaintiffs' police-shooting deadly force claim. The district court's view of the facts regarding this claim, if true, constitutes a violation of Bing's "clearly established" right not to be attacked with deadly force.

The district court's view of the facts relevant to the deadly force claim is not clear from its opinion. However, after reviewing the district court's opinion, the parties' briefs, and the record, and after having participated in oral argument, we agree with counsel for the plaintiffs that the district court likely assumed the following facts regarding the officers' invasion of the house and shooting of Bing: (1) when the officers entered the house, Bing did not fire a gun at them; (2) Bing posed no safety threat to anyone at that point; and (3) the officers shot Bing in the back without provocation. Tr. Oral Arg. 26:22-53 (audio recording). We assume these facts to be true for purposes of this interlocutory appeal. *See Johnson*, 515 U.S. at 319 (noting that if the district court does not specify the facts it assumed when it denied qualified immunity, "a court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed").

The district court in particular made several observations related to the evidence in this case that cause us to attribute these assumptions to the district court. For instance, the district court stated that Bing's gun, recovered from the burned-down house, did not bear Bing's fingerprints. The district court further noted that the coroner's report and the autopsy report reflected that Bing had been shot in the back. Finally, the district court cited a purported expert's opinion that the police version of events—in which Bing fired first and the police fired back defensively—was inconsistent with the physical evidence in this case.

This set of facts assumed by the district court, if true, constitutes a violation of Bing's Fourth Amendment right against the use of deadly force. If, indeed, Bing did not have the gun after the police entered the house and posed no safety threat to anyone when he was shot to death in the back, then the danger he had once posed had abated. Under these assumptions, the officers had no legitimate interest in using deadly force that could counterbalance Bing's fundamental interest in his

life. Therefore, under these assumptions, the *Graham* balancing test compels the conclusion that Bing's rights would have been violated. *See Smith*, 430 F.3d at 774-75.

Moreover, the right allegedly violated is clearly established under the Supreme Court's ruling in *Tennessee v. Garner*. *See* 471 U.S. at 9, 11. *Garner* holds that the police may not shoot a fleeing nondangerous suspect in the back of the head. *See id. Garner*'s "[g]eneral statement" of this legal principle is "capable of giving clear and fair warning to officers even where 'the very action in question has (not) previously been held lawful.'" *Smith*, 430 F.3d at 776 (quoting *Anderson*, 483 U.S. at 640). No reasonable officer could fail to see that shooting an unarmed man in the back who has ceased to present a danger violates *Garner*.

The district court therefore properly denied summary judgment to the officers with respect to the police-shooting deadly force claim.[3]

## IV.

For the foregoing reasons, the judgment is reversed regarding all claims except the police-shooting deadly force claim. The denial of summary judgment as to the police-shooting deadly force claim is affirmed. The case is remanded for proceedings consistent with this opinion.

---

[3]The officers argue in their brief that defendants Showalter, Snider, Alan, Brandeberry, and Forbes were present merely as backup and thus deserve qualified immunity. For support, the officers cite *Aquisto v. Danbert*, which held that officers' participation in a constitutional violation must extend beyond mere "presence" before they can be held liable under § 1983. *See* No. 97-1668, 1998 U.S. App. LEXIS 21694, *10-*12, *14-*15 (6th Cir. Sept. 1, 1998). However, the district court had no opportunity to address the officers' argument based on *Aquisto* because the officers did not cite this case in their brief before the district court. Nor did they argue in the district court that these defendants provided mere backup.

Instead, the officers argued, without citing any law, that Sgt. Martin alone used "force" on Bing. For instance, the officers argued in the district court that Officer Salyers "did not use force or deadly force" on Bing because the shots he fired at Bing with his service weapon *did not actually hit him*. The officers thus argued that actions such as shooting at Bing but not hitting him, or (in the case of Detective Grebb) employing a flashbang that did not actually kill Bing, do not constitute "force." This argument based on the meaning of "force" is distinct from the argument raised in this court based on *Aquisto*—that defendants Showalter, Snider, Alan, Brandeberry, and Forbes were present merely as backup. Indeed, the distinctness of the two arguments can be readily seen from the officers' decision not to argue that Officer Salyers and Detective Grebb were present as mere backup, while in the district court the defense argued that neither of these policemen used any "force" on Bing. Because the officers raise their *Aquisto*-based argument for the first time on appeal, we decline to consider it. *See Saylor v. United States*, 315 F.3d 664, 669 (6th Cir. 2003).

———————————————

**CONCURRENCE**

———————————————

RONALD LEE GILMAN, Circuit Judge, concurring.  I fully agree with the majority that summary judgment was properly denied as to the claim by Bing's estate that the police used excessive force in trying to arrest Bing.  My primary disagreement with the majority relates to its holding that "exigent circumstances" justified the warrantless intrusions into Bing's residence in the first place.  I would hold that such intrusions violated his Fourth and Fourteenth Amendment rights, even though I ultimately agree that the constitutional violation was not so clearly established at the time of the events in question as to deny the officers qualified immunity.

My view of this case starts with the fundamental principle that "searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980).  Although exigent circumstances can overcome this presumption, the only possible exigency that would be applicable here is that "the suspect represented an immediate threat to the arresting officers or the public."  *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989).  I do not believe that such an immediate threat was present in the case before us.

In particular, I do not find this circuit's decision in *O'Brien v. City of Grand Rapids*, 23 F.3d 990 (6th Cir. 1994), to be distinguishable.  If anything, that was a stronger case for finding an exigency because O'Brien had "previously shot and wounded a citizen in the front yard of the same premises" to which the officers responded.  *Id*. at 1000.  O'Brien had shown more than a willingness to fire his weapon in the air; he had demonstrated in the past a willingness to *shoot a person in his yard*.  Despite these circumstances, this court still concluded that there were no exigent circumstances justifying an exception to the warrant requirement.  *Id*. at 998.

I acknowledge the fact that, in *O'Brien*, four-and-one-half hours passed prior to the police inserting the first probe into O'Brien's house, *id*. at 998, whereas here only two hours and thirteen minutes went by before the police broke out a window and threw in the bag phone.  But here, like in *O'Brien*, Bing had taken no action against the officers or anyone else in the period of time between their arrival on the scene and when they finally acted.  *See id*. at 997.  He had no hostages, was not brandishing a gun, and was not shouting at the police or the neighbors.  Like in *O'Brien*, "there [wa]s no evidence establishing that the threat of danger was 'immediate.'"  *Id*. at 998.  I see no reason why there was not sufficient time under the circumstances for the police to seek a warrant to enter Bing's house.

The majority attempts to analogize the present case to *Hancock v. Dodson*, 958 F.2d 1367 (6th Cir. 1992), in order to demonstrate that the officers in this case were presented with exigent circumstances, going so far as saying that the facts here present an even stronger case for exigency.  I respectfully disagree.  In *Hancock*, the police responded to reports of an unstable man in the midst of a domestic dispute who had gone out to his barn with one of his guns.  *Hancock*, 958 F.2d at 1369.  When Hancock spoke with a police radio dispatcher who called his house, he said "if you send any cops over here, I'll kill them."  *Id*.  When the police arrived, one officer approached the back screen door of Hancock's house.  *Id*.  From that vantage point, the officer could see a gun near the front door, could hear yelling in a hostile tone, and could see Hancock standing on the front porch, but could not tell whether he was armed.  *Id*. at 1369, 1375.  The officer then entered the house and moved to the front door.  *Id*. at 1369.  Upon reaching the front door, the officer drew his gun, opened the door, and stepped out onto the porch where Hancock was verbally confronting other officers on the scene.  *Id*.  This court concluded that "the factual record amply demonstrate[d] that exigent circumstances existed" to enter Hancock's home.  *Id*.

This case is different from *Hancock*. When the officer in *Hancock* entered the house, the potential gunman posed far more of an immediate threat. Hancock had told the police dispatcher that he would *kill* any responding officers. Moreover, the officer could see a firearm within a short distance of Hancock, and he could see Hancock himself, who was on the porch shouting at other officers in a hostile tone. These circumstances are a far cry from those in this case, where Bing (1) had withdrawn into his house for over two hours before the police broke his window and progressively inserted a bag phone, pepper gas, and flashbangs, (2) had not been brandishing a gun, (3) had not declared that he would kill the officers, and (4) was not standing on his porch shouting at the police at the time of the entry, or even communicating with the police at all.

The majority posits, however, that the presence of the neighbors who refused to evacuate the surrounding area heightened the threat that Bing presented. This fact allegedly helps to distinguish *O'Brien*, because there the police had successfully evacuated the neighbors early on in that standoff. *O'Brien*, 23 F.3d at 993. But the majority's reliance on the presence of unevacuated neighbors rewards the police for their failure to properly utilize their authority to force the evacuations of those who were presumably endangered by an allegedly dangerous gunman. I am concerned that this rationale will encourage the police to not protect bystanders in order to help justify a warrantless entry on the basis of exigent circumstances.

In the end, I find this case to be closer to *O'Brien* than to *Hancock*, and thus believe that there were no exigent circumstances justifying a warrantless entry into Bing's home. I would therefore conclude that the officers violated Bing's constitutional rights. On the other hand, I believe that they are entitled to qualified immunity because this case is not so close to *O'Brien* as to have put a reasonable officer on notice that his conduct was illegal. There is, for example, an admittedly large disparity between *O'Brien* and this case in terms of the hours of delay prior to taking invasive action. Moreover, even if the officers failed in their duty to protect the public by not forcibly evacuating Bing's neighbors, there were in fact bystanders in the area. The presence of the bystanders may have caused a reasonable officer to believe that the threat to the public was greater than that presented in *O'Brien*.

So even though I conclude that the officers were mistaken in their belief that exigent circumstances were present, they should be protected by qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." ); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). I thus reluctantly agree with the majority that the warrantless intrusions into Bing's home do not in themselves provide a basis to hold the officers personally liable.