*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                          *Plaintiff-Appellee,*

                                                            No. 12-5878

     *v.*

KEVIN PATRICK DAWS,
                          *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:11-cr-10051-1—J. Daniel Breen, District Judge.

Decided and Filed: April 2, 2013

Before: DAUGHTREY, SUTTON and KETHLEDGE, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Daniel J. Taylor, JACKSON, TENNESSEE, for Appellant. James Powell, UNITED STATES ATTORNEY'S OFFICE, Jackson, Tennessee, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. The question presented in this case is whether a public-safety exigency justified a warrantless search of Kevin Daws's home. We think it did, and so did the district court before us. We therefore affirm.

I.

Sheriff's deputies in Henderson County (Tennessee) received word of an armed home invasion on a winter evening in 2010. They went to the crime scene, where the victim reported what had happened. The victim, who knew Daws, recounted that Daws

had crashed a shotgun barrel through a glass window, then charged into the house. Daws forced the victim to his knees and thrust the gun in his face. Daws took a wad of cash and, before leaving, warned the victim that if he called the police, Daws would "come back and kill him." R.65 at 20–21.

Toward the end of the interview, the officers received a second call about Daws, prompting them to go to another house. That occupant, who also knew Daws, said that Daws and another unnamed man had come over with a bundle of money and a shotgun, asking for a place to hide the weapon. The man refused, turned Daws away and called police, understandably worried that Daws would return to harm him.

The deputies also knew Daws. He had previous convictions for weapons violations, he was a convicted felon, and a neighbor had previously reported him for firing shots in his front yard. One deputy had been a corrections officer in the prison where Daws served time for aggravated burglary after holding a gas station attendant at gunpoint and threatening to kill him. Based on the two incidents and this background information, the deputies resolved to do two things: promptly apprehend Daws and be careful, the last of which prompted them to don body armor, call for backup and approach Daws's rural house quietly.

Upon reaching Daws's house, the deputies saw one of his friends sitting outside on a tree stump. He was crying and, as they approached, the officers overheard him confess to someone on the phone that he and Daws had "done something bad" and were probably going to jail. *Id.* at 25. The deputies apprehended the man, and he told them Daws was inside. The deputies entered the house through an open door and found Daws asleep in the living room. After apprehending him, they performed a protective sweep of the house, which led to the discovery of Daws's shotgun.

Federal prosecutors charged Daws with possession of a firearm and ammunition by a convicted felon. *See* 18 U.S.C. § 922(g). Daws pleaded guilty, and the court sentenced him to 210 months in prison. The plea agreement reserved Daws's right to appeal the district court's denial of his motion to suppress the evidence found in his house.

II.

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  Among many other requirements, the guarantee requires police to obtain a warrant before entering a suspect's home unless exigent circumstances justify a reasonable officer's belief that immediate action is necessary.  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  As relevant here, an immediate risk of injury to the police or others inside or outside a home justifies a warrantless entry.  *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).  In assessing that risk, the police must make practical, on-the-spot decisions.  The gravity of the crime being investigated, the likelihood that the suspect is armed and the suspect's willingness to use a weapon all factor into the reasonableness equation.  *Id.*; *Bing ex rel. Bing v. City of Whitehall, Ohio*, 456 F.3d 555, 564 (6th Cir. 2006).  When a district court denies a suppression motion, we "draw all factual inferences in favor of upholding the district court's suppression ruling."  *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009).

A confluence of reasonable concerns justified the immediate entry into Daws's home.  Daws committed a serious crime:  He forced his way into a neighbor's home, the significance of which Daws surely understands given the refuge he now seeks in the sanctity of his own home.  Nor was this merely an invasion of the neighbor's privacy:  Daws was armed, stuck a gun in the man's face and threatened to use it—then and later.  The risk of injury to others escalated as events transpired during the two-hour period between the initial call and the arrest:  The deputies received back-to-back reports that Daws was going from house to house threatening people with a shotgun.  Nor did Daws make vague threats:  He told the robbery victim that he would "come back and kill" the man if he called the police, a condition by then fulfilled, R.65 at 21; and when the second victim refused to hide his shotgun, Daws threatened him too, so much so that the victim was afraid Daws would "come back and hurt him."  *Id.*  This also was not the deputies' first encounter with Daws:  They knew about his extensive criminal history and his proclivity for using guns in threatening and reckless ways.  All of this understandably led the officers to go straight to Daws's house to bring an immediate end

to his serial threats and to eliminate the greater risk that he would act on them. When the deputies arrived at Daws's home, they found a man crying on a tree stump and overheard him confess to a crime that would justify jail time for him and Daws. At this point, even the most reticent officer could be forgiven for taking matters into his own hands—and for halting an escalating set of risks.

All things considered, the situation presented a "potential for injury to the officers or others and the need for swift action." *United States v. Huffman*, 461 F.3d 777, 785 (6th Cir. 2006). The necessary delay associated with the alternative—getting a warrant—would have heightened the risk that Daws would act on the threats or make a run for it. The Fourth Amendment does not require police to ignore the real risk of a shootout or of a suspect's escaping and making good on death threats.

Daws offers several rejoinders, all unconvincing. He downplays the seriousness of the night's events, noting that he never fired any shots. The short answer is: not yet and not that day. Officers need not wait until a suspect acts on a threat before taking action. An "exigency exists when officers can demonstrate that a suspect has a willingness to use a weapon." *Bing*, 456 F.3d at 564 (internal quotation marks omitted); *cf. United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996) (criminal record and violent reputation justify dispensing with knock and announce). Nor does Daws offer any support for the notion that a report of shots fired is a mandatory minimum of exigent circumstances. Perhaps because it is not true: In many cases, waiting until shots have been fired is another way of waiting too long.

Although shots fired often will themselves trigger exigent circumstances, Daws's actions gave officers comparable reasons to believe they faced an immediate risk. Consider *Bing*, where officers received a report that William Bing had "fired a gun into the air and into the ground near his home." *Bing*, 456 F.3d at 558. Police also knew that Bing had fired shots on a previous occasion and that he was intoxicated. That sufficed to show Bing had "a willingness to use a weapon" and that exigent circumstances justified entry into his home. *Id.* at 564. Daws, sure enough, had not yet fired any shots into the air or the ground that day. But he had used his gun in an armed robbery, aimed

it at the victim's face, and threatened to kill him—and had fired random shots from his home before.   From where we sit, it is not clear whose actions—Bing's or Daws's—showed a greater willingness to use a weapon in the near term.  Neither suspect had yet shot *at* anyone.  Yet both presented a serious and immediate risk to the public safety.

The length of time between Daws's robbery and the deputies' search—two hours—does not help Daws either.  That is not a long period of time to visit three houses in a rural county in response to two armed encounters and threats.  The deputies received the first report at 7 p.m.  It took an hour to drive from the sheriff's department across the county to the robbery location.  They then went from one house to the next without a break in the action until arriving at Daws's house.  What these events may show and what the lapse of two hours (normally) shows is that this was not a hot pursuit, at least not in the classic sense.  But that was not the key exigency in this engaged pursuit.  The risk was that Daws would come out shooting or escape and seek vengeance, a risk that two hours' time did not extinguish.  *See id*. at 565.  Daws still had "access to his gun" and an apparent "willingness to fire it."  *Id.*

Nor did this rural setting undermine the need to take immediate action.  The risk of injury from stray bullets may be greater in urban Nashville than in a Henderson County cornfield.  But the deputies reasonably feared more than stray bullets.  Just as risky was the possibility that Daws would open fire on the deputies while trying to escape or that, having escaped, he would use the shotgun on the first victim, the second victim or both.

Once the deputies surrounded the house, that too did not eliminate the risk.  They had no way of knowing that Daws was asleep.  So far as they knew, he was loading his gun and preparing for a confrontation.  For that matter, until the deputies entered the house, they could not confirm the truth of the crying man's statement that Daws was in the house.  He was after all Daws's accomplice, and for all the deputies knew Daws had already left the home in search of one or the other victims.  Daws's actions throughout the night, coupled with his prior criminal history, justified a belief that Daws was

dangerous and that speed and surprise were essential.  No Fourth Amendment violation occurred.

III.

For these reasons, we affirm.