**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVEN FISHER,
          *Plaintiff-Appellee,*
     and

SANDRA FISHER,
                    *Plaintiff,*

     v.

CITY OF SAN JOSE,
          *Defendant-Appellant,*
     and

CITY OF SAN JOSE POLICE
DEPARTMENT; OFFICER BOLER;
OFFICER BARNETT; OFFICER CORREA;
OFFICER ESQUIVEL; OFFICER HONDA;
OFFICER KINSWORTHY; OFFICER
O'BRIEN; OFFICER RYAN; OFFICER
NGUYEN,
                    *Defendants.*

No. 04-16095

D.C. No.
CV-01-21192-PVT

ORDER AND
OPINION

Appeal from the United States District Court
for the Northern District of California
Patricia V. Trumbull, Magistrate Judge, Presiding

Argued and Submitted
April 5, 2006—San Francisco, California

Filed November 20, 2007

Before: David R. Thompson, Marsha S. Berzon, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Callahan

15039

**COUNSEL**

Clifford S. Greenberg, Senior Deputy City Attorney, San Jose, California, for defendant-appellant City of San Jose.

Donald E.J. Kilmer, Jr., San Jose, California, for plaintiff-appellee Steven Fisher.

**ORDER**

The opinion filed on January 16, 2007 is hereby withdrawn and replaced by this concurrently filed opinion. The pending petition for rehearing en banc is denied as moot. The parties may file new petitions for rehearing.

**OPINION**

BERZON, Circuit Judge:

Steven Fisher claims constitutional violations stemming from a twelve-hour standoff at his apartment between him and a large number of San Jose police officers, at the end of which he came out of the apartment and submitted to arrest. He sued the city of San Jose ("the City") and several officers under 42

U.S.C. § 1983, contending, among other things, that the arrest was invalid because the police never obtained or attempted to obtain a warrant. A jury found for the defendants on all claims, including a claim for warrantless arrest. Fisher thereupon filed a renewed motion under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on the warrantless arrest claim. Granting the motion against the City, the district court ordered the City to pay nominal damages of one dollar and issued an injunction regarding future training of police officers. We uphold the district court's ruling on appeal, as we agree that the failure to obtain a warrant under the circumstances of this case constituted a constitutional violation as a matter of law.

## I. Background

### A. The Standoff

On the afternoon of Saturday, October 23, 1999, Fisher bought two twelve-packs of beer and settled in at home for an evening of watching the World Series and cleaning rifles from his collection of approximately eighteen World War II-era firearms. Both the guns and the beer figured prominently in the ensuing events.

Those events began when, around midnight, Leo Serrano, a security guard at Fisher's apartment complex, was walking near Fisher's apartment investigating noise complaints regarding Fisher's upstairs neighbor. Fisher's apartment is on the bottom floor of the apartment complex and has a sliding glass door leading out to an enclosed patio; passers-by can see into the apartment through the glass door. Noticing Fisher in his apartment, Serrano motioned for him to come outside and speak with him. Fisher walked out, carrying the rifle he had been cleaning when Serrano called to him.

When Serrano asked Fisher about the noise coming from his upstairs neighbor, Fisher was generally unresponsive,

eventually changing the subject to the Second Amendment. Throughout the short conversation, Fisher held his rifle in various positions. Whether Fisher pointed the rifle at Serrano is not clear: At trial, Serrano testified that Fisher did not, but an officer who had been called to the scene testified at trial that when he arrived at Fisher's apartment complex, Serrano told him that Fisher had pointed the rifle toward him during the initial encounter. Either way, Serrano suspected that Fisher was intoxicated and, feeling uncomfortable and frightened in Fisher's presence because of the liquor, the gun, and the odd reaction to Serrano's questions, left to tell his supervisor about his interaction with Fisher. The supervisor notified the police, who responded by sending officers to the scene.

Sergeant Ryan was among the first to arrive, at around 2 a.m. After speaking with Serrano, Ryan approached Fisher's patio and attempted to get Fisher's attention by throwing small rocks at the sliding glass doors. Fisher came to the door but, rather than answering Ryan's questions, spoke in a rambling fashion of his Second Amendment rights. Ryan, too, believed that Fisher was intoxicated.

After Ryan tried to speak with Fisher, more police officers began arriving at the scene; eventually, over sixty officers participated in the standoff. Early on, some officers telephoned Fisher's apartment. When Fisher's wife, Sandra, answered the phone, the officers instructed her to leave the apartment, which she did. It is not clear whether she put the phone back on the hook, but it was busy throughout the remainder of the standoff. When she emerged, Sandra informed the police that no one other than Fisher was inside the apartment. She also confirmed that Fisher had eighteen rifles in the apartment and had been drinking.

At approximately 3 or 4 a.m., Jan Males, a tactical negotiator, arrived and tried to communicate with Fisher. Unprompted, Fisher informed Males that he had a right to bear arms. He invited Males into his apartment but said he would shoot her

if she did come in. Males determined that this statement was a criminal threat, a felony.

Aside from that interaction, throughout the early morning Fisher repeatedly told the police to "go away, leave me alone, and don't bother me." Twice during that period, Officer Boler, who was observing the apartment from across the street, reported that Fisher was pointing one of his rifles at Ryan and Males, who were the officers closest to Fisher's apartment and were sheltering themselves behind a tree. Boler also reported that Fisher was moving the rifles around his apartment. Despite these observations and the threat to Males, no officer told Fisher during those early morning hours that he was under arrest.

Fisher was last seen with a rifle at approximately 6:30 a.m. A little while later, at around 7 a.m., the Mobile Emergency Response Group and Equipment ("MERGE") team came to the scene, replacing the patrol officers who had arrived first.[1] Some of the replaced patrol officers returned to the station house to write police reports about the incident.

The MERGE team finished evacuating all residents from the surrounding apartments at 7:30 a.m. At that point, believing that Fisher had committed a crime — pointing a rifle at police officers — the MERGE team focused its efforts on forcing him out of his apartment to arrest him. Officers used a bullhorn to ask Fisher to leave his apartment, but did not tell him he was under arrest. The officers had Fisher's power turned off at 8:48 a.m. and then broke the sliding glass doors so a "throw phone"[2] could be tossed through, as Fisher's phone remained busy. At 10:52 a.m., the police set off a "flash-bang" device, designed to get Fisher's attention and disorient him briefly. Two hours later, at approximately 1:00

---

[1] The MERGE team was called at 4:45 a.m.

[2] A throw phone is a phone encased in a box that also contains an open microphone.

p.m., the police began throwing CS gas canisters into Fisher's apartment.[3] One of the CS gas volleys sent glass flying, cutting Fisher's forehead above one eye.

At 2 p.m., the police again attempted to contact Fisher, this time by bullhorn. They finally achieved telephone contact, via the throw phone, at 2:13 p.m. Fisher stated at that point that he was willing to leave his apartment and offered to leave naked so that the police would not suspect him of carrying a weapon. When the police told him that this was not necessary, he said that he would come out in his boxers and socks. The police approved this plan.

Fisher emerged from his apartment at 2:35 p.m. He initially followed police instructions, walking in the designated direction and keeping his hands in the air. Soon, however, he stopped walking forward. One of the officers thereupon shot him in the leg with a "sage gun," which shoots less-than-lethal rubber bullets. Fisher then lay down on the ground, and the officers handcuffed him and took him into custody.

Some of the police officers involved in the first shift who returned to the police station after they left in the morning testified that they had intended to arrest Fisher. All the police officers who were asked at Fisher's § 1983 trial whether they attempted to procure a warrant said they had not, including some of those who returned to the station in the morning. Also, all of the officers who were asked testified that they did not believe a warrant was necessary. Finally, all of the officers who were asked testified that they knew that judges are available twenty-four hours a day to issue warrants.

Fisher was tried for felony violations of California Penal Code sections 417 and 417.8, which prohibit, in general, drawing, exhibiting, or using a firearm or deadly weapon against a peace officer or with the intent to resist or prevent

_____

[3]CS gas causes irritation and burning sensations.

an arrest. The jury deadlocked, and Fisher then pleaded no contest to a misdemeanor charge of brandishing a firearm in the presence of a security officer.

## B.  **The Lawsuit**

Fisher and his wife sued the City, the San Jose Police Department, and several San Jose police officers. They alleged, among other causes of action, that (1) Fisher's warrantless arrest was an unreasonable seizure; and (2) the use of the sage gun and of the CS gas constituted state law batteries. The basis for the claim against the City was that it was "either jointly and severally liable; *and/or* vicariously liable through the doctrine of *respondeat superior* for the actions of its employee police officers also named herein in their individual capacity."

After an eight-day jury trial, Fisher filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), but the court denied the motion. The jury then found for the defendants on all claims. After the jury verdict, Fisher filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). The court denied the motion on all other grounds but granted it as to the warrantless arrest claim against the City.

In so ruling, the district court laid out its reasoning in some detail. Observing that "[t]he very circumstances under which Steven Fisher w[as] arrested negate any implication that there was any great exigency in arresting him without securing a warrant," the court ruled that, because "between 6:30 a.m. and the time Fisher was taken into custody at 2:35 p.m., no exigency existed[,] . . . Defendants . . . had ample opportunity and time to seek a warrant from a neutral and detached 'magistrate,' as they were required to do under law." The court expressed skepticism as to why, when "well over sixty officers [were] present at the Fisher's apartment complex," not

one of them was able to seek a telephone warrant before Fisher submitted to arrest.

The court awarded one dollar in nominal damages to Fisher and injunctive relief, ordering the City to train its officers "on what is required under the Fourth Amendment and the case law interpreting it lawfully to arrest a suspect in his or her home and on the procedures for obtaining warrants both in-person and on the telephone." The City now appeals, challenging only the court's constitutional determination regarding the failure to obtain a warrant.

## II. Standard of Review

This appeal arises from the grant of a Rule 50(b) renewed motion for judgment as a matter of law. That Rule provides:

> If the court does not grant a motion for judgment as a matter of law made [under Rule 50(a)], the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion . . . .

Fed. R. Civ. P. 50(b). It is thus Rule 50(a) that sets out the standard for granting Rule 50(b) motions — whether there is a "legally sufficient evidentiary basis [for a reasonable jury] to find for that party on [an] issue," and, if not, whether "a claim or defense . . . can, under the controlling law, be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a). "Sufficient evidence" is "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

This court reviews the district court's grant of a renewed motion for judgment as a matter of law de novo. *Id*. The district court's "judgment is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only

one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.* Moreover, "when reviewing a motion for judgment as a matter of law, we apply the law as it should be, rather than the law as it was read to the jury," even where the party failed to object to the instructions. *Pincay v. Andrews*, 238 F.3d 1106, 1109 n.4 (9th Cir. 2001).[4]

---

[4]The City argues, to the contrary, that because Fisher did not object to the instructions at trial, he can make a Rule 50(b) motion only on the ground that, on the jury instructions given, no substantial evidence supported the verdict. This argument is not illogical, but it is incorrect.

True, an "appellant may not challenge on review the correctness of instructions to which he took no exceptions or only a general exception." *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 182 n.5 (9th Cir. 1989) (quoting *Coca Cola Bottling Co. of Black Hills v. Hubbard*, 203 F.2d 859, 862 (8th Cir. 1953), and noting the Supreme Court's implicit adoption of this principle in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). But that principle does not foreclose appellate review of an underlying legal question in the case through a Rule 50(b) motion. " '[T]he failure to object to an instruction does not render the instruction the "law of the case" for purposes of appellate review of the denial of a directed verdict or judgment notwithstanding the verdict.' " *City of St. Louis v. Praprotnik*, 485 U.S. 112, 120 (1988) (plurality opinion) (quoting *City of Springfield v. Kibbe*, 480 U.S. 257, 264 (1987) (O'Connor, J., dissenting)). If a party moves under Rule 50 for judgment as a matter of law both before and after the verdict, as Fisher did, the motions are "sufficient to preserve the . . . issue for appeal, '[a]lthough the same legal issue was raised by both those motions and [by] the jury instruction." *Air-Sea Forwarders*, 880 F.2d at 183 (quoting *Praprotnik*, 485 U.S. at 120) (second alteration in original). As the jury instructions on the warrant issue do not matter to our review of the grant of the Rule 50(b) motion, we do not consider them.

## III. Warrantless Arrest or Seizure

### A. Arrest or Seizure Inside the Home and Exigent Circumstances

#### 1. The Warrant Requirement

**[1]** In general, police may not enter a person's home to arrest him without obtaining a warrant. *See Payton v. New York*, 445 U.S. 573, 589-90 (1980); *United States v. Prescott*, 581 F.2d 1343, 1350 (9th Cir. 1978).[5] Indeed, "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see also Frunz v. City of Tacoma*, 468 F.3d 1141, 1142 (9th Cir. 2006) ("Physical entry into the home is the 'chief evil against which the wording of the Fourth Amendment is directed.' " (quoting *United States v. U.S. District Court*, 407 U.S. 297, 313 (1972)); *LaLonde v. County of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000) (noting "the home is perhaps the most sacrosanct domain and . . . there, Fourth Amendment interests are at their strongest"). To protect this right to privacy in the home, the decision as to whether sufficient probable cause exists to arrest someone at home cannot be left to police officers:

> [Fourth Amendment] protection consists in requiring
> that [inferences from the evidence] be drawn by a

---

[5]Although the words of the Fourth Amendment are familiar, it is worth recalling them before embarking on an exegesis of the warrant requirement in the unusual circumstances here presented. The Fourth Amendment reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. . . . When the right of privacy must reasonably yield . . . is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Johnson v. United States*, 333 U.S. 10, 14 (1948); *see also Steagald v. United States*, 451 U.S. 204, 212 (1981) ("The purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search."). As a result, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590.

**[2]** Because the warrant requirement for in-home arrests is based on an understanding of the sanctity of the home, it is primarily concerned with *entries* into a home to effect an arrest, not with the seizure of the individual. Thus, "the critical time for determining whether any exigency exists is the moment the officer makes the warrantless *entry*." *United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001) (en banc) (per curiam) (emphasis added). As explained in the Second Circuit's opinion upon which *Payton* relied as "persuasive":

> To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.

*United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978) (quoted with approval in *Payton*, 445 U.S. at 588-89). Indeed, as the facts of *Payton* itself illustrate, a warrantless entry made for purposes of arrest or seizure is constitutionally

invalid even if no arrest ensues because the suspect is not there. *See id.* at 576-77.

**[3]** In determining whether an arrest occurs in a home or in a public place, "it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980), *aff'd*, 457 U.S. 537 (1982). Applying that concept, every court that has considered the issue, including our own, has concluded that if the police force a person out of his house to arrest him, the arrest is deemed to have taken place *inside* his home, and the *Payton* warrant requirement applies. *United States v. Johnson*, 626 F.2d at 757. In *United States v. Al-Azzawy*, 784 F.2d 890 (9th Cir. 1985), for example, "the police had completely surrounded appellee's trailer with their weapons drawn and ordered him through a bullhorn to leave the trailer and drop to his knees." *Id.* at 893. Because the defendant "was in his trailer at the time he was surrounded by armed officers, and since he did not voluntarily expose himself to their view or control outside his trailer but only emerged under circumstances of extreme coercion, the arrest occurred while he was still inside his trailer." *Id.; see also Bing ex rel. Bing v. City of Whitehall*, 456 F.3d 555, 564 (6th Cir. 2006) ("By laying siege to Bing's house, breaking his door and windows, and employing pepper gas, the police accomplished . . . a Fourth Amendment seizure."); *Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002) ("[P]olice efforts to force a barricaded individual out of a home are properly treated as seizures . . . ."); *Sharrar v. Felsing*, 128 F.3d 810, 819 (3d Cir. 1997) ("[W]hen a SWAT team surrounds a residence with machine guns pointed at the windows and the persons inside are ordered to leave the house backwards with their hands raised, an arrest has undoubtably occurred."); *United States v. Maez*, 872 F.2d 1444, 1450 (10th Cir. 1989) (holding that defendant was arrested in his home when a SWAT team holding rifles surrounded his trailer and asked him to leave his home by means of a loudspeaker); *United States v. Morgan*, 743 F.2d 1158,

1164 (6th Cir. 1984) (concluding defendant "was placed under arrest, without the issuance of a warrant, at the moment the police encircled [his] residence").

**[4]** The *Al-Azzawy* principle, and therefore the *Payton* warrant requirement, necessarily applies, moreover, to in-house seizures that do not amount to a formal arrest. We have held that although Fourth Amendment seizures that do not amount to arrests may be accomplished on reasonable suspicion rather than probable cause under *Terry v. Ohio*, 392 U.S. 1, 20 (1968), the special status of in-house seizures recognized in *Payton* means that "probable cause is a precondition for any warrantless entry to seize a person in his home." *LaLonde*, 204 F.3d at 954.[6] For similar reasons, any in-house seizure must be subject to the warrant requirement as well, absent an applicable exception. We agree in this regard with the Sixth Circuit, which has reasoned as follows:

> [L]ike a full-blown arrest, an investigatory detention is a seizure that is subject to Fourth Amendment scrutiny. Thus, *Payton*'s holding that warrantless seizures of persons in their homes violate the Fourth Amendment, absent exigent circumstances, applies . . . regardless of whether the officers at issue were conducting an arrest or an investigatory detention.

*United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001) (citations omitted).

**[5]** It therefore does not matter for present purposes whether any seizure of Fisher that occurred before he was taken into custody at the conclusion of the standoff would have amounted to an arrest or only to a *Terry* seizure had the seizure occurred outside the home. Either way, a warrant was presumptively required.

---

[6]Fisher concedes that probable cause to believe he committed a crime existed during the standoff.

## 2.   Exceptions to the Warrant Requirement

The warrant requirement, however, is not without exceptions. Defendants rely in this case on the exigency exception to the warrant requirement.

[6] The exigency exception can excuse a warrant for an in-home arrest when probable cause exists and there is a compelling reason for not obtaining a warrant — for example, a "need to protect an officer or the public from danger, [a] need to avoid the imminent destruction of evidence, when entry in 'hot pursuit' is necessary to prevent a criminal suspect's escape, [or a need] to respond to fires or other emergencies." *United States v. Brooks*, 367 F.3d 1128, 1133 n.5 (9th Cir. 2004) (citations omitted), *cert. denied*, 543 U.S. 1058 (2005).

As the term "exigency" suggests,[7] however, such circumstances are not alone enough to establish exigency and thereby to excuse the warrant requirement. Instead, " '[w]hen an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.' " *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984) (quoting *McDonald v. United States*, 335 U.S. 451, 460 (1948) (Jackson, J., concurring)). Consequently, a situation is exigent for purposes of permitting an arrest without a warrant only if a warrant could not be obtained in time to effect the arrest safely — that is, for present purposes, without causing a delay dangerous to the officers or to members of the public. *See Michigan v. Tyler*, 436 U.S. 499, 509 (1978) ("[A] warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and *no time to secure a warrant*." (emphasis added)); *United States v. Robertson*, 606 F.2d 853, 859 (9th Cir. 1979) (holding exi-

---

[7]Merriam-Webster's Collegiate Dictionary defines "exigent" as "requiring *immediate* aid or action." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 406 (10th ed. 1999) (emphasis added)."

gent circumstances exist where "a substantial risk of harm to the persons involved or to the law enforcement process would arise *if the police were to delay a search until a warrant could be obtained*" (emphasis added)).

**[7]** Inherent in this standard, as the just-quoted italicized language indicates, are considerations regarding the time required, as a practical matter, to obtain a warrant. Consequently, where exigency is claimed, we have required "the government either to attempt, in good faith, to secure a warrant or to present evidence explaining why a telephone warrant was unavailable or impractical." *United States v. Alvarez*, 810 F.2d 879, 883 (9th Cir. 1987) (footnote omitted).

The appropriate moment for assessing whether the requirements for the exigency exception are met is the moment at which any entry to effect an arrest or to conduct a search occurs. *See United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001) ("the critical time for determining whether any exigency exists is the moment the officer makes the warrantless entry"). Even where exigent circumstances existed to conduct a search or effect an arrest at some earlier moment, an arrest warrant will be required as soon as those exigent circumstances pass.

In *Mincey v. Arizona*, 437 U.S. 385 (1978), for example, the Supreme Court made clear that "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.' " *Id*. at 393. The Court noted that while it was acceptable for officers arriving at the scene of a homicide to "make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the loose," no exigent circumstances justified a search of a homicide scene without a warrant once "all the persons" on the scene had been located and the suspect arrested. *Id.* Thus, the warrantless search of the murder scene a mere ten minutes after all injured parties were removed and the premises secured violated the Fourth Amendment. *Id*. at 388-89, 393; *see also Johnson*, 256 F.3d

at 907-08 (holding that, although there might have been exigency had the deputy pursuing the suspect followed him immediately into the house, there was no exigency by the time the deputy entered because he waited half an hour for backup to arrive and returned to the site where he lost the suspect to retrieve his pepper spray container).[8]

---

[8]The dissent repeatedly maintains that, once exigent circumstances exist, no further actions to effect a search or seizure ever require a warrant. *See* Diss. Op. at 15073, 15075, 15076-77, 15084 ("[n]either our precedent, nor any other federal case, has ever required officers to obtain a warrant to justify a seizure after exigent circumstances were legitimately established"). As both *Mincey* and *Johnson*, discussed above, illustrate, this is simply not so.

The dissent relies heavily on *Michigan v. Tyler*, 436 U.S. 499 (1978), in which the Supreme Court addressed "the applicability of the Fourth and Fourteenth Amendments to official entries onto fire-damaged premises." *Id.* at 501. The Court held that officials "need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze" because "[p]rompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring" and "[i]mmediate investigation may also be necessary to preserve evidence from . . . destruction." *Id.* at 510. The Court held that the reentry of officials four hours after the blaze was extinguished was permissible as part of that "reasonable investigation" because officials were not required to remain in the building while they were severely hampered by "darkness, steam, and smoke." *Id.* at 511.

The dissent's reliance on *Tyler* is misplaced. First, *Tyler* involved an investigation into the cause of a fire by fire officials, rather than a criminal investigation by the police. *See Michigan v. Clifford*, 464 U.S. 287, 291 (1984) ("in *Tyler*, we restated the Court's position that *administrative* searches generally require warrants") (emphasis added). Moreover, the significance of *Tyler* was substantially limited by *Mincey*, decided less than a month later, which makes clear that in the criminal law enforcement context, exigent circumstances are always assessed at the time of the search. Second, *Tyler* addressed a search of a burned-out furniture store, rather than a home. *Id.* at 297 (distinguishing *Tyler* as a case in which the owners had a lessened privacy interest in their property than would "a homeowner [who] ha[d] made a reasonable effort to secure his fire-damaged home"). Lastly, in *Tyler* the Supreme Court authorized a search that was a "continuation" of exactly the same activity in which officials had begun to engage as a result of exigent circumstances; it did not pur-

**[8]** Here, none of the officers testified that there was any attempt to get a warrant at any point during the twelve-hour standoff, by telephone or otherwise. The City can therefore prevail only if it satisfactorily demonstrates that exigent circumstances existed such that a warrant was impractical or unavailable at the time of any entry into Fisher's home to effect his arrest.

### 3.   The Warrant Requirement and Stand-Offs

The City maintains that it met this standard by showing that there was a seizure of Fisher before 6:30 a.m. and that the exigency standard was met at the time that seizure occurred. We may — and will — assume that both the City's premises are true: that is, that there was a seizure of Fisher in his home in the early morning hours and that both prongs of the exigency exception — danger and lack of time to obtain a warrant without risking harm to some person — were met at that time. But the City's argument contains an unarticulated assumption — that the responsibility to obtain a warrant lapses entirely at the time a seizure first occurs, even if many hours ensue before the targeted person submits to custody and is formally

---

port to excuse a situation in which officials change tactics and escalate their intrusions into an individual's home in the absence of exigent circumstances. *Tyler*, 436 U.S. at 511.

The dissent's reliance on *United States v. Echegoyen*, 799 F.2d 1271 (9th Cir. 1986), is similarly misplaced. *Echegoyen*, while it involved law enforcement officers, concerned a serious fire hazard. *Id.* at 1280. More importantly, in *Echegoyen* the court specifically held that there was insufficient time for officers to obtain a warrant because "the delay associated with obtaining a telephonic warrant would have unduly increased the risk that the officers reasonably believed to be present." *Id.* As the dissent acknowledges, a second entry was permitted because it was itself "done to alleviate the exigent circumstances" existent at a moment when delaying to obtain a warrant would be dangerous. *Id.* at 1280; Diss. Op. at 15078. It therefore cannot stand for the principle that warrantless entries are permitted even where there is sufficient time to obtain a warrant safely.

arrested, and even if the police take steps in the interim period that further intrude into the surrounded house. That assumption, we conclude, is unwarranted.

**[9]** We have found no case of this court that directly addresses whether police must obtain a warrant during a standoff such as occurred here between the police and a citizen if any initial exigency dissipates before further intrusions into the home to coerce the targeted individual to submit to arrest. We conclude, however, from our review of cases from other circuits involving police standoffs that the *Payton* warrant requirement does not evaporate the moment officers surround a home with weapons and begin to take measures to induce an individual to leave his home. Rather, officers must obtain a warrant before any additional intrusions into the home if the initial exigency dissipates sufficiently to allow the police to obtain a warrant.[9] The initial exigency can dissipate either because the danger posed by the targeted individual decreases or because, with the passage of time, resources become available that allow the police both to maintain safety and to obtain a warrant.

To explain our conclusion, we begin by noting that in most of the cases holding that there was an in-home seizure accomplished by armed police surrounding the home, the surrounded individual left his home essentially simultaneously with the in-home seizure as he was ordered to do, and was then taken into custody by the police. *See Al-Azzawy*, 784 F.2d at 891; *Sharrar*, 128 F.3d at 815-16; *Maez*, 872 F.2d at 1446-47, 1449-50; *Morgan*, 743 F.2d at 1161. The courts in these cases had no reason to determine whether any exception operative at the outset of the action continues to apply if there

---

[9]We need not and do not decide whether a warrant would be required if armed police surrounded an individual in his home, but during the standoff made no further intrusions into the home for purposes of effecting an arrest. In this case, police clearly did intrude into the home after the initial seizure by throwing CS gas canisters into Fisher's house.

is a lengthy standoff between police and the seized person. Those cases that *have* discussed prolonged police standoffs, however, have not treated a seizure as a single event that ends the moment a residence is surrounded, nor have they viewed the warrant requirement as lapsing once a seizure of this variety begins.

In *Sharrar*, for example, the court analyzed a situation in which officers surrounded the home of an individual suspected of a crime and then forced him and other occupants outside at gunpoint. *See* 128 F.3d, at 814-17. The court noted that "[t]he police have not satisfactorily explained why, when the house was completely surrounded by an armed SWAT team, they could not secure the premises while they went to procure an arrest warrant." *Id.* at 820. The court's analysis indicates that even if the initial surrounding of a house without a warrant is justified by exigent circumstances, the warrant requirement does not evaporate once police surround the home, and the police remain obligated to obtain a warrant once the danger has lessened or resources have become available such that a warrant could be safely obtained.

The Sixth Circuit in *Bing* applied this approach in its analysis of a five-hour police standoff. In that case, the police surrounded the home of a man who had fired a weapon in front of his house in the vicinity of neighborhood children. 456 F.3d at 559. Police "attempt[ed] to force him outside" by using pepper gas and a flashbang device, and, after approximately five hours, raided his home and shot him. *Id.* at 559-62. In determining whether the police violated Bing's rights by effecting a warrantless entry into his home, the Sixth Circuit first held that "[b]y laying siege to Bing's house, breaking his door and windows, and employing pepper gas, the police accomplished a . . . Fourth Amendment seizure" subject to the warrant requirement. *Id.* at 564. The Sixth Circuit then proceeded to analyze whether exigent circumstances existed to excuse the warrant requirement *throughout the period of the standoff*, ultimately holding that, under the par-

ticular circumstances, the "exigency did not terminate due to the passage of time." *Id*. at 565. *Bing* considered whether exigency existed to justify the lack of a warrant at the time of each of the warrantless entries into Bing's home, noting, for example, that "exigency existed to justify shooting pepper gas into the house without a warrant." *Id.* at 567. The court in *Bing* thus necessarily recognized that passage of time during a standoff can, under some circumstances, lead to an opportunity to obtain a warrant safely that did not exist at the outset, and that, if such an opportunity appears before further intrusions are made to accomplish the final arrest, the warrant requirement is not excused. Absent such an understanding, there would have been no reason for the lengthy analysis in *Bing* directed at demonstrating that the exigency continued throughout the course of the standoff, including before each additional police action designed to force the suspect from his home. *See id.* at 565-69.

[10] *Bing*'s approach is consistent with the Sixth Circuit's other standoff cases and with the law of this circuit on exigency. In *O'Brien v. City of Grand Rapids*, 23 F.3d 940 (6th Cir. 1994), the Sixth Circuit analyzed a standoff in which the police, after waiting outside O'Brien's home for more than six hours, inserted three small probes without a search warrant.[10] *Id*. at 994. The court did not consider whether exigent circumstances existed when the police first surrounded O'Brien's home, but did hold that any exigency had dissipated by the time the probes were inserted because O'Brien "had taken no action against the officers" for the previous five hours, he was completely surrounded and could not flee the scene, and he was "not holding anyone hostage."[11] *Id*. at 997. Our cases,

---

[10]The dissent notes, correctly, that *O'Brien* addresses whether and when a search warrant is required to undertake further intrusions into a home after it has been surrounded in a standoff, not whether and when an arrest warrant is required. Diss. Op. at 15083. That distinction does not matter, however, for present purposes, as the "exigency" concept is the same for the two types of warrants.

[11]*Bing* is also consistent with *Ewolski*, in which the Sixth Circuit held that the Fourth Amendment applies to a police standoff that ultimately

too, assume that any exigency that exists at the beginning of a police encounter may, in some circumstances, end as a result of the passage of time or other factors, triggering a requirement to obtain a warrant. *See, e.g.*, *United States v. Lindsey*, 877 F.2d 777, 782 (9th Cir. 1989) (analyzing whether exigency had dissipated during a one-hour delay before arresting defendant in his home).

[11] This approach to exigency analysis during police-citizen standoffs is consistent with the principles of *Payton* and the purposes of the warrant requirement. As discussed above, *Payton* is primarily concerned with the prevention of warrantless entries into a home. To hold that the warrant requirement ceases to apply in a standoff as soon as police have surrounded a residence would be to permit officers to invade the sanctity of the home indefinitely and in new, more intrusive ways without the oversight of a neutral and detached magistrate. Such a holding would negate the principle that officers who act without a magistrate must always be prepared to demonstrate that they could not have safely obtained a warrant. We therefore conclude that, should exigency dissipate after an individual has been seized by means of police surrounding his home but before the individual is taken into custody, officers are required to attempt to obtain a warrant before they take additional, intrusive steps to effect the arrest. This is not to say that there is no end to the warrant requirement in a standoff situation. Once officers have subdued the individual and taken him into custody, there is obviously no further need to obtain a warrant, and the application of the exigency requirement is tested by the circumstances extant before that occurred. That is why there is no need to obtain a warrant where, as in *Al-Azzawy*, the seizure by surrounding the house and the taking of the suspect into custody were

---

ended in a raid of a home. The court did not have occasion to consider in *Ewolski* whether the warrant requirement applied to the standoff, nor whether any such requirement was excused by exigent circumstances.

essentially simultaneous and there were exigent circumstances at that time. 784 F.2d at 894 (finding exigency at time defendant was arrested). If, however, an individual remains in his home for a long period of time despite being surrounded by armed officers, his liberty has been sufficiently restrained so as to have been seized, *see Ewolski*, 287 F.3d at 506, but he has not yet been brought into police custody or formally placed under arrest. The police are, of course, unlikely to cease at that point to attempt to bring the suspect into actual custody and formally to arrest him. So long as the standoff continues and the police continue to make entries into the suspect's home in order to arrest him, the *Payton* warrant requirement remains triggered.

As should be evident, the dissent's suggestion, *post* at 15073, that we are requiring a retroactive warrant is simply incorrect. Although a seizure is initially accomplished by surrounding a home, the police in such instances may — as here — take additional steps that intrude further into the home, and do not accomplish the formal arrest until the individual surrenders. To view this entire sequence of events as a single police decision made at the outset is both to indulge in a fiction and severely to undermine the warrant requirement. So, for example, had Fisher refused to come out and had the police therefore decided forcibly to enter Fisher's home at 2:30 p.m., that decision and action could not reasonably be viewed as outside the warrant requirement on the ground that Fisher had already been seized at home earlier.

## B.   **The Warrant Requirement and Seizure of Fisher**

The City contends that Fisher was arrested by 6:30 a.m. — after the police officers on the scene had surrounded Fisher's home, attempted to convince him to come outside to talk, and positioned a sharpshooter to observe his actions — and that any warrant requirement applies only to the period before 6:30 a.m. Because there were exigent circumstances until 6:30 a.m., the City argues, the warrant requirement was excused.

Applying the principles already discussed to the facts in the record, we conclude that the City's position is not supported by legally sufficient evidence.

**[12]** We do not disagree that Fisher was seized when police surrounded his home and stationed a sharpshooter to watch him, or that the warrant requirement applied to this seizure, absent exigency. *See Al-Azzawy*, 784 F.2d at 893. But despite having been seized, it is indisputable that Fisher had not yet been placed under formal arrest and brought into the custody of the police. Because Fisher remained in his house, not free to leave but not in the custody of the police, he continued to be subjected to entries into his home for the purpose of forcing him outside to arrest him, and the *Payton* warrant requirement continued to apply. As a result, we must ask whether any exigency that existed at 6:30 a.m. dissipated before police made further entries into Fisher's home.[12] We conclude that there was insufficient exigency to justify a warrantless arrest

---

[12]As noted earlier, *Alvarez* tolls the period of exigency during the officers' attempts to obtain a warrant, as warrants cannot be obtained instantaneously. 810 F.2d at 883 (holding that the Fourth Amendment "requires the government either . . . *attempt*, in good faith, to secure a warrant or . . . present evidence explaining why a telephone warrant was unavailable or impractical" (emphasis added) (footnote omitted)). We thus require only that officers begin to attempt to obtain a warrant when that attempt becomes feasible, given all the circumstances, while continuing in the meantime their efforts to maintain the peace and bring the suspect under control.

We also do not mean to suggest that more than one arrest warrant is required. *Cf. Carlson v. Landon,* 342 U.S. 524, 546-47 (1952) (recognizing that even once an arrest warrant is fully executed, rearrest may be possible without a new warrant, especially in cases when the detainee has escaped); *United States v. Martin,* 399 F.3d 879, 881 (7th Cir. 2005) ("The fourth amendment's rules for warrants do not include time limits."). Rather, our point is that there were police activities taken *after* 6:30 a.m. for which one arrest warrant could have been obtained without a dangerous delay, and that a warrant was therefore required.

of Fisher at least by the time the CS gas canisters[13] were thrown into his home at approximately 1:00 p.m.[14]

As we have emphasized, to come within the exigency exception, the City must show *both* that dangerous circumstances existed and that it was infeasible to obtain a warrant safely. *See United States v. Manfredi*, 722 F.2d 519, 522-23 (9th Cir. 1984). We have used a nonexhaustive list of factors, first enunciated in *Dorman v. United States*, 435 F.2d 385, 392-93 (D.C. Cir. 1970) (en banc), to determine whether dangerous circumstances exist for purposes of the exigency exception. *See United States v. Blake*, 632 F.2d 731, 733 (9th Cir. 1980).[15] Those criteria are: (1) "that a grave offense is involved"; (2) "that the suspect is reasonably believed to be armed"; (3) that there exists "a clear showing of probable cause"; (4) that there is "a strong reason to believe that the suspect is in the premises"; (5) that there is "a likelihood that the suspect will escape"; and (6) that peaceable entry is made onto the premises. *See Dorman*, 435 F.2d at 392-93.

Viewing the evidence in the light most favorable to the City, it was not unreasonable for the jury to find that the officers were justified in considering Fisher a danger both to them and to the public when they first surrounded his home in the early morning hours. Although no grave offense was involved, Fisher was armed, was certainly on the premises, and concedes that there was probable cause to arrest him. He was also intoxicated and had made at least one threatening

---

[13]Tossing the CS gas canisters into the house was an independent use of force within the home. *Cf. Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1129-30 (9th Cir. 2002) (holding that reasonable juror could conclude that use of pepper spray constituted excessive force).

[14]Because we conclude that there was no exigency by the time officers threw the CS gas canisters into Fisher's home at 1 p.m., we need not consider whether there was exigency at the time of any of the other intrusions into Fisher's home.

[15]*Dorman* explicitly noted that the list of considerations was not comprehensive. 435 F.2d at 392.

comment to an officer.[16] Moreover, it was not unreasonable for the jury to conclude that *some* level of danger persisted throughout the duration of the standoff, as Fisher remained inside his apartment, intoxicated and with access to weapons.

At the same time, the danger of the situation, if it did not terminate entirely after 6:30 a.m., certainly did not increase, and to some degree lessened. All nearby residents were evacuated at around 7:30 a.m. Furthermore, Fisher was not seen carrying a rifle for a full seven hours after 6:30 a.m., as the district court emphasized in granting the Rule 50(b) motion. During that post-6:30 a.m. period, Fisher took no further threatening actions, toward the police or anyone else. Nothing happened after 6:30 a.m. that increased the danger of the situation.

[13] As to the second prong of the exigency exception — which requires that "the government . . . show that a warrant could not have been [safely] obtained in time," *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986) — the evidence, taken in the light most favorable to the government, clearly shows that there were enough officers working on Fisher's case with enough time to obtain a warrant safely before the police sent the first of the CS gas canisters into Fisher's apartment. Given the level of danger after 6:30 a.m., which remained significant but was not increasing, officers had the resources to begin the warrant process without risking the safety of officers or the public. Some of the original officers left the scene at 7 a.m. and returned to the station house,

---

[16]We note that while Fisher's comment that he would shoot the police officer if she entered his home was a threat (albeit a conditional one), the fact that he had earlier discussed his Second Amendment rights while holding a gun cannot reasonably be construed as a threat. The Second Amendment — whatever its precise parameters, *compare Nordyke v. King*, 319 F.3d 1185 (9th Cir. 2003), *with Nordyke v. King*, 364 F.3d 1025, 1026 (2004) (Gould, J., dissenting from denial of rehearing en banc) — concerns, after all, the right to "bear" arms, not the right to use them to shoot people.

where they or their colleagues could have initiated warrant proceedings. By 1 p.m., many officers had been at Fisher's apartment complex for several hours; in total, more than 60 officers participated over the course of the standoff between the police and Fisher. As the District Court noted, "Defendants have offered no explanation, and none exists, as to why [not] *one* of these officers was [ ]able to seek and obtain a telephone warrant or make use of the procedures available twenty-four hours a day to obtain a warrant from a judge in person . . . ."

These facts clearly distinguish this case from *Bing,* a case that is in some respects quite similar to this one. Bing had fired his gun in the vicinity of neighborhood children, "police had been called to Bing's residence in the past [because] he previously had fired shots," neighborhood residents refused to evacuate thereby increasing the danger, and police had reason to believe that Bing had fired a shot at police officers before they raided his apartment. 456 F.3d at 559-62. None of these factors existed in Fisher's standoff with police. Moreover, as far as appears in the *Bing* opinion, none of the police on the scene returned to the station during the standoff. The level of danger in *Bing* was thus considerably higher than here, while the officers' opportunity to obtain an arrest warrant was not obvious.

This case is also quite different from the Ninth Circuit case on which *Bing* relies. Unlike the one-hour delay in searching a suspect's house that we considered in *Lindsey*, 877 F.2d at 782, the time the officers spent outside Fisher's apartment complex was not unexpected, caused by lack of additional assistance, nor, comparatively, short.[17] Instead, the standoff in

---

[17]The dissent states that our "position that courts may analyze exigency after the seizure of a surrounded suspect, *without evidence of any facts that negate the initial exigent circumstance*, implicitly overrules *Lindsey*." Diss. Op. at 15075, n.3 (emphasis added). We do not hold, however, that a warrant is required in a standoff case where nothing has occurred to

this case is much more similar to that in *O'Brien*, where, after an initial confrontation, O'Brien took no aggressive action for more than five hours, allowing the police an opportunity safely to obtain a warrant. *See* 23 F.3d at 997. Indeed, *O'Brien* arguably presented a *more* dangerous situation than that in this case, because police were aware that O'Brien had used his weapon in the past to shoot a neighbor in his front yard. *Id.* at 993.

**[14]** The only reasonable conclusion on the record before us is that, although the situation was not without danger, the police had sufficient resources and time after probable cause was established to obtain an arrest warrant before they intruded into Fisher's home by tossing in CS gas canisters. Although our dissenting colleague maintains, quite sensibly, that the danger created by Fisher's actions did not completely disappear until he submitted, she fails entirely to address whether the police had enough time and manpower to seek a warrant safely during the extended standoff. Because there was such an opportunity, the failure to obtain or attempt to obtain a warrant was unconstitutional.[18]

## IV.   Conclusion

Standoffs with barricaded suspects present hard decision-

---

negate the exigency. Here, in contrast to *Lindsey*, circumstances did change so as to cause the exigency to dissipate. Unlike in *Lindsey*, where the surrounded suspect was awaiting the return of a drug courier and likely to become more suspicious, and therefore more dangerous, with every passing minute, the passage of time at Fisher's apartment caused the exigency to lessen, as he was not seen with a weapon for at least six hours, residents were successfully evacuated, and many more officers arrived on the scene. *See Lindsey*, 877 F.2d at 782.

[18]The dissent speculates that "the officers would appear to be entitled to qualified immunity." Dissenting Opinion at 15081, n.9. As no liability was imposed on the officers, we express no opinion as to whether the officers in this or a similar case would be entitled to qualified immunity.

making problems for police, often requiring split-second tactical determinations. The results can be tragic even when police behavior is quite reasonable. *See*, *e.g.*, *Ewolski*, 287 F.3d at 499 (involving the target of a standoff who shot himself and his son during the standoff). A warrant may not prevent such tragic occurrences. But interposing a neutral and detached magistrate between the police, who are "acting under the excitement that attends the capture of persons accused of crime," *United States v. Lefkowitz*, 285 U.S. 452, 464 (1932), and the citizen, who may or may not have committed a wrong, may, on occasion, bring a useful perspective to the situation. *Id.* ("[T]he informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers and others who may happen to make arrests."). The warrant requirement's purpose is to permit a third party to evaluate whether the police should intervene in a situation at all. If not, police retreat can prevent a potentially dangerous situation from escalating into a tragic one.

Here, it may well be that a timely application to a magistrate would have resulted in issuance of a warrant for Fisher's arrest and events would then have proceeded pretty much as they did. But that is not certain, and is in any event beside the point. The criminal jury hung on the felony count presented to it, so it is at least possible that a magistrate would have thought the police lacked probable cause on the charge for which he was arrested. More importantly, it is precisely to require the officers involved to articulate the grounds for arrest and to obtain the views of a dispassionate magistrate on the adequacy of those grounds that a warrant is required.

Here, there were plenty of police officers involved and there was plenty of time to obtain such a warrant. It was unconstitutional to fail to do so.

**AFFIRMED.**

CALLAHAN, Circuit Judge, dissenting:

I respectfully dissent.

What we have here is a very dangerous situation that was resolved safely for all concerned — Fisher, the public, and the police — because of good police work. Nevertheless, the majority penalizes the police by announcing a new warrant requirement and imposing liability upon them for failing to obtain a telephonic arrest warrant in the midst of a police standoff that could have turned deadly at any moment.[1] After reviewing all the facts and receiving proper instructions on the law, twelve jurors unanimously found that the police had handled the situation lawfully. We should accept the wisdom of the jurors' decision.

As judges, we should not arm-chair quarterback a crisis from the safety of our chambers. Such post-game analysis is disconnected from reality and leads to the puzzling determination in this case that San Jose police officers need training despite the jury's finding that they did nothing wrong. The police handled the situation in exemplary fashion and in full compliance with the law. Exigent circumstances excused the warrantless arrest, and the exigent circumstances continued until the police completed that arrest when Fisher surrendered. I would reverse the district court's grant of Fisher's Federal Rule of Civil Procedure 50(b) motion and restore the jury's verdict because the verdict was supported by substantial evidence.

A renewed motion for judgment as a matter of law pursuant

---

[1]Our precedents acknowledge that "[a] telephonic warrant may not be obtained simply by calling a magistrate. Among other things, a 'duplicate original warrant' must be prepared in writing and read to the magistrate verbatim." *United States v. Manfredi*, 722 F.2d 519, 523 (9th Cir. 1983). Furthermore, we have concluded that it is "not a simple procedure." *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986).

to Fed. R. Civ. P. 50(b) is properly granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Id.* Indeed, we may not substitute our view of the evidence for that of the jury. *Id.* The majority simply disregards this standard.

The majority now assumes that the San Jose Police Department seized Fisher for purposes of the Fourth Amendment before 6:30 a.m., when they began surrounding his apartment, and that exigent circumstances existed at the time of this seizure. After acknowledging that there is no case addressing whether the police must obtain a warrant if any initial exigency dissipates during the standoff, the majority proceeds to conclude that officers must obtain a warrant during the standoff to justify additional intrusions into the home if the initial exigency dissipates. The majority concludes that the exigent circumstances dissipated in this case because of the lack of activity or communication from Mr. Fisher, despite the fact that he still had access to guns, was still acting irrationally, and a jury's conclusion that exigent circumstances existed. The majority cites cases suggesting that officers may need to get a *search* warrant to conduct additional intrusions into the home to justify imposing a requirement that officers obtain an *arrest* warrant when no further seizure occurs. The only conclusion supported by case law and consistent with common sense, however, is that once a suspect is seized in his home, and there are actually exigent circumstances to justify the arrest, then there is no need to obtain an arrest warrant because there is no additional seizure requiring a warrant. Law enforcement activity to complete the initial seizure in the home is a continuation of the intrusion or seizure in the home, and it does not require an additional arrest warrant.

## FACTS

The following facts emerge from the record. Fisher was drinking and cleaning 18 guns in his apartment. A security guard at his apartment complex called the police when Fisher's behavior became menacing. The police arrived shortly after midnight. Fisher was unresponsive for the most part, but insisted on talking about his Second Amendment rights. At approximately 3:00 – 4:00 a.m., Officer Jan Males, a tactical negotiator, arrived. Fisher told her that he had a right to bear arms. He also invited her into his apartment but threatened to shoot her if she came in. Officer Males considered this to be a criminal threat — a felony.

Throughout the morning, officers observed Fisher through the windows of his apartment walking around with a rifle in his hand, and more than once, aiming the rifle out of the apartment in the general direction of the officers. Officer Boler testified that he saw Fisher point one of his rifles toward Sergeant Ryan and Officer Males twice between 2:45 a.m. and 4:00 a.m. and that he was moving his rifles around his apartment. At 6:23 a.m., Fisher was seen again with a rifle, apparently loading it.

At 7:00 a.m., the department's Mobile Emergency Response Group (MERGE) took control of the scene, and the officers who originally responded to the scene left. By 7:30 a.m., the police had evacuated all of the apartments in Fisher's building. One occupant, whose front door was near Fisher's residence, was evacuated by cutting a hole in her apartment wall that allowed her to leave through a neighboring apartment instead of walking across the front of Fisher's apartment. At 8:48 a.m., the police turned off the power in Fisher's apartment in an attempt to force him out. They also broke his sliding glass door and tossed in a "throw phone" so that they could communicate with Fisher because his phone line was busy. At 10:52 a.m., the police set off a "flash-bang" device to get Fisher's attention and briefly disorient him. At

1:00 p.m., police began throwing gas canisters into the apartment, to no avail. Finally, at 2:13 p.m., police established telephone contact with Fisher via the throw phone and he agreed to leave the apartment unarmed. The police then took him into custody.

## DISCUSSION

A warrantless search does not violate the Fourth Amendment where officers have probable cause to believe that a crime has been committed, and there are exigent circumstances such that a warrant could not have been obtained without causing a dangerous delay. *Manfredi*, 722 F.2d at 522. Fisher concedes that officers had probable cause, and the majority now gives credit to the jury's finding that there were exigent circumstances when the officers seized Fisher by surrounding his house and showing force. The majority, however, determines that it was "not unreasonable" for the jury to find that the officers were justified in arresting Fisher in his home and that it was "not unreasonable" for the jury to conclude that the danger persisted throughout the standoff.[2] (Maj. Op. at 15065.) Yet the majority concludes that the exigency somehow lessened to the point where some sort of post-hoc or retroactive warrant was required, despite the lack of any sort of intervening Fourth Amendment search or seizure. Neither our precedent, nor any other federal case, has ever required officers to obtain a warrant to justify a seizure after exigent circumstances were legitimately established. Yet the district court, and now the majority, saw fit to overrule the jury's verdict.

---

[2]The majority's acknowledgment that the facts do not compel a single perspective is a concession that there is *not* only one reasonable conclusion that is contrary to the jury's verdict. Accordingly, we are not at liberty to disturb the verdict. *Pavao*, 307 F.3d at 918.

A.  Once exigent circumstances exist to justify the warrantless seizure, a warrant is not required unless there is another seizure.

Although the government must "show that a warrant could not have been obtained in time" when attempting to establish exigent circumstances, once exigent circumstances exist, the warrantless seizure is justified. *Good*, 780 F.2d at 775. This is because a showing of exigent circumstances "overcome[s] the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). Exigent circumstances are determined at the time of the arrest or search. *See Cardwell v. Lewis*, 417 U.S. 583, 595-96 (1974) ("The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action."). In the context of searches, the Supreme Court has stated, "we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment." *Id.* at 595.

Exigent circumstances are "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Brooks*, 367 F.3d 1128, 1135 (9th Cir. 2004) (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984)). "The exigencies must be viewed from the totality of circumstances known to the officers at the time of the warrantless intrusion." *United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985). As the Supreme Court recognized in *Brigham City v. Stuart*, "[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." ___ U.S. ___, 126 S. Ct. 1943, 1949 (2006).

The majority acknowledges that the pertinent time to determine whether an exigency exists is at the time that the arrest is effectuated, but then proceeds to ignore that principle to hold that, during armed standoffs, officers must obtain a warrant to justify a seizure that has already happened under exigent circumstances. The Fourth Amendment simply does not require after-the-fact warrants to justify events that already occurred under exigent circumstances. That is the entire point of exigent circumstances — they justify a Fourth Amendment event, in this case the seizure of Fisher in his home.[3] Unless there is another Fourth Amendment event, there is no reason to obtain a warrant to justify an arrest that has already occurred and will continue until the arrest is complete.[4] *See United States v. Snyder*, 852 F.2d 471, 473-74 (9th Cir. 1988) (finding acts incident to a valid arrest did not constitute additional arrests); *United States v. Wulferdinger*, 782 F.2d 1473, 1477 (9th Cir. 1986) (refusing to reach other questions once probable cause and exigent circumstances were found).

B.   A standoff is a continuation of the original seizure justified by exigent circumstances.

There is no case law that supports the idea that officers must obtain warrants to justify searches or seizures that have

---

[3]In *United States v. Lindsey*, 877 F.2d 777, 782-83 (9th Cir. 1989), we concluded that it was improper to evaluate exigent circumstances *after* the warrantless entry, and that a one-hour delay while officers waited for backup "did not dissipate the exigency." The majority's position that courts may analyze exigency after the seizure of a surrounded suspect, without evidence of any facts that negate the initial exigent circumstance, attempts to implicitly overrule *Lindsey*.

[4]The majority's analysis addresses additional intrusions, as opposed to the arrest. We cannot decide issues concerning searches or seizures of property because the Constitution "limits our role to resolving the '[c]ases' and '[c]ontroversies' before us"; therefore "we decide only the case at hand." *Hein v. Freedom from Religion Found., Inc.*, ___ U.S. ___, 127 S. Ct. 2553, 2572 (2007). As a result, we are limited to reviewing only the warrantless arrest.

already begun under exigent circumstances while the search or seizure is in progress. Of course, exigent circumstances must truly exist *before* the officers undertake the search or seizure in order to justify the Fourth Amendment event.[5] Also, officers must show that it was impractical or impossible to obtain a warrant *before* the search or seizure in question in order to show exigent circumstances.[6] *See e.g.*, *United States v. Echegoyen*, 799 F.2d 1271, 1279 (9th Cir. 1986); *Good*, 780 F.2d at 775; *Manfredi*, 722 F.2d at 523.

There is no support, however, for the idea that, after exigent circumstances have been established and the officers lawfully arrest a person in his or her home, the officers must then go and obtain an arrest warrant to retroactively justify an arrest. Our court has condemned obtaining post-hoc or retroactive warrants as "alien to the Fourth Amendment warrant and reasonableness requirements."[7] *United States v. Allard*, 634 F.2d 1182, 1187 (9th Cir. 1980) (*Allard II*). Indeed, in every case where exigent circumstances justified an initial intrusion, the exigency "dissipated" in some manner — whether because the suspect is arrested after a hot pursuit, the premises are secured to prevent an escape or destruction of evidence, or a danger to the public is neutralized. We have

---

[5]As a result, cases such as *Sharrar v. Felsing*, 128 F.3d 810, 820 (9th Cir. 1997), where there was insufficient evidence that exigent circumstances existed as a matter of law at the time of arrest to support summary judgment are distinguishable. To the extent that *Sharrar* considered exigent circumstances to be a jury question, the jury here explicitly found that exigent circumstances existed.

[6]Under the majority's reasoning, a clever attorney can now argue that the fact that the officers obtained an arrest warrant at some point shows that they could have obtained a warrant, thus defeating the initial exigency. We should not subject officers to this type of "damned if you do, damned if you don't" approach to liability.

[7]In *United States v. Allard*, 600 F.2d 1301, 1304 (9th Cir. 1979) ("*Allard I*"), we stated that later obtained warrants "could not retroactively authorize the entry." Yet the majority now insists that officers must obtain a warrant to justify an arrest that has already occurred and that officers are simply seeking to complete.

*never* required the officers to, after the fact, go back and obtain a warrant to justify the initial lawful intrusion. This is because once exigent circumstances excuse the initial intrusion, officers are allowed to continue with activities until the intrusion — in this case the arrest of Fisher — is complete.

The Supreme Court has held that once an arrest is justified by exigent circumstances, no warrant is required so long as the seizure continues. *Michigan v. Tyler*, 436 U.S. 499, 510-11 (1978) (concluding that a search that was "an actual continuation" of an intrusion justified by exigent circumstances did not require a further warrant); *United States v. McLaughlin*, 525 F.2d 517, 521 (9th Cir. 1975) (once an exigency exists, officers are allowed to enter a home to arrest suspects and secure the premises without a warrant). In *Michigan v. Tyler*, the Supreme Court found that firefighters, as well as arson inspectors and a detective, could enter a home without a warrant because the exigent circumstances created by a fire justified the warrantless intrusion. 436 U.S. at 509. The Supreme Court specifically rejected the Michigan Supreme Court's "holding that the exigency justifying a warrantless entry to fight a fire ends, and the need to get a warrant begins, with the dousing of the last flame." *Id.* at 509-10. The Court concluded that restricting the range of activities excused by the exigency to extinguishing the fire was "unrealistically narrow." *Id.* at 510.

In *Tyler,* the fire chief, a detective, and some investigators left the scene at approximately 4:00 a.m., when the fire was extinguished. *Id.* at 502. They returned later that morning after the sun came up and conducted additional investigation without consent or a warrant for the entries or seizure of evidence. *Id.* The Supreme Court found that although the fire chief, the detective, and other personnel left the scene, their entries "were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence." *Id.* at 511. Therefore, if the initial warrantless event was justified by exigent circumstances, actions

that are continuations of that event are also excused. If leaving the scene for a brief period of time constitutes a continuation, then a continuous police standoff certainly is an actual continuation of the initial arrest.

In *United States v. Echegoyen*, 799 F.2d at 1280, we came to the same conclusion in the context of a warrantless arrest followed by a search by narcotics detectives. After smelling ether, a flammable substance, in the air and determining that there was possibly a serious fire hazard posed by the ether, deputies entered a house and arrested its occupants without a warrant. *Id.* at 1274. With the suspects in custody, the deputies and a firefighter re-entered the home, turned off the gas burners on a stove, opened the windows, and inspected the residence. *Id.* During their inspection, the deputies saw drug processing equipment, chemicals, and white powder that was later revealed to be cocaine. *Id.*

We concluded that the initial entry into the house and arrest of the residents was justified by exigent circumstances. *Id.* at 1279-80. Then we decided that "the subsequent entry by the narcotics detectives is also as [sic] valid as a continuation of the initial lawful entry." *Id.* at 1280 (citing *Tyler*). After summarizing *Tyler*, we held that "this second entry was merely a continuation of the initial lawful entry because both were done to alleviate the exigent circumstances." *Id.* As a result, we affirmed the denial of a motion to suppress evidence seen by the narcotics detectives. *Id.*

Pursuant to *Tyler* and *Echegoyen*, the initial warrantless seizure of Fisher inside his home was excused by exigent circumstances. Even assuming that the exigency somehow dissipated, the police activities during the standoff to complete the seizure are simply a continuation of the initial lawful seizure. Efforts to communicate with the barricaded suspect, determine his well being, and even to force a conclusion to the standoff are all activities "done to alleviate the exigent circumstances," that is, to neutralize the threat that Fisher posed

to the neighborhood by completing the seizure. *Echegoyen*, 799 F.2d at 1280. Armed standoffs are essentially continuations of arrests that are begun under exigent circumstances. Without an intervening event, such as an actual escape or the officers abandoning their siege followed by another attempt to arrest the suspect or search the premises, there is no new Fourth Amendment event that requires a warrant.

C.   Case law is contrary to the majority's position.

The majority acknowledges that there is "no case of this court that directly addresses whether police must obtain a warrant during a standoff such as occurred here" and then proceeds to carve out a new Fourth Amendment requirement using slivers of dicta and ignoring Supreme Court precedent.

The majority attempts to build its argument for a warrant requirement during an ongoing standoff upon *Mincey v. Arizona*, 437 U.S. 385, 390-93 (1978), a case where the Supreme Court rejected a murder scene exception to the general warrant requirement. *Mincey*, however, did not invalidate the continuation of the initial entry into the home to arrest a suspect, to investigate the welfare of the undercover officer after shots were fired, or to look for more victims. *Id.* at 388. The Supreme Court expressly acknowledged that the activities in continuation of the initial intrusion were already completed when the homicide detectives entered the scene to *search* for evidence. *Id.* at 388-89, 93 (noting that the sweep of Mincey's apartment for victims and other occupants and securing the scene was separate from the four-day search for evidence that followed). To distinguish *Tyler*, the Supreme Court stated that "it simply cannot be contended that this search was justified by any emergency threatening life or limb."

What is clear from the Supreme Court's discussion in *Mincey* is that a warrantless *search* must be related to, or a continuation of activity excused by, the exigent circumstances and that there is no per se exception for particularly grave

crimes. *Id.* at 393-94. Our case simply does not involve a subsequent entry to search for evidence of a crime. Rather, the issue is only whether an arrest warrant was necessary to seize Mr. Fisher in his home. The arrest was not completed, however, until the officers had physical custody of Mr. Fisher or he submitted to the show of authority and surrendered. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (stating that a completed "arrest requires *either* physical force" or "*submission* to the assertion of authority."). We must not lose sight of the fact that Mr. Fisher is contesting his warrantless arrest, not a separate or subsequent search.

In an attempt to further bolster its position, the majority reads *United States v. Alvarez*, 810 F.2d 879, 883 (9th Cir. 1987), to support an argument that we require a good-faith effort to obtain a warrant in *every* case where the government claims exigent circumstances. *Alvarez* is factually distinguishable because the exigent circumstance claimed in *Alvarez* was that the police feared a suspect in another location might become suspicious if there was additional delay before delivery of a large amount of cocaine. *Id.* at 880. Furthermore, the holding in *Alvarez* was that exigent circumstances did not exist that could excuse the absence of, or failure to obtain, an arrest warrant at the time the arrest occurred. *See id.* at 881, 882 (reviewing "a conclusion of exigent circumstances" de novo and concluding that "[t]he agent's actions in this case were thus fundamentally inconsistent with any true exigency.").

In this case, the majority acknowledges that at the time the officers surrounded Fisher's house, exigent circumstances excused the need to obtain an arrest warrant to seize Fisher in his home. The dicta from *Alvarez* quoted by the majority does not require that law enforcement make a good-faith effort to seek a warrant when exigent circumstances actually existed to excuse the absence of a warrant.[8] *Id.* at 883. Rather, the pas-

---

[8]The full passage from *Alvarez* reads:

The government argues that obtaining a telephone warrant is not

sage stands for the unremarkable proposition that the government must either present sufficient evidence of exigent circumstances or have some other justification for not obtaining a warrant at the time of an arrest.[9] *Id.*

The majority also turns the Sixth Circuit's decision in *Estate of Bing v. City of Whitehall*, 456 F.3d 555 (6th Cir. 2006), on its head by interpreting its dicta to state that exigent circumstances may dissipate sufficiently to somehow require a warrant. *Bing* simply concludes "that exigency did not terminate due to the passage of time or the police's actions." *Id.* at 565. Specifically, the Sixth Circuit noted that, "[t]he passage of time did not terminate the exigency because the ticking of the clock did nothing to cut off Bing's access to his gun, or cure him of his willingness to fire it, or move to safety the people nearby who refused to evacuate." *Id.* Noting that the police had to take time to gather intelligence, wait for backup, and execute their plan, the Sixth Circuit concluded that these acts "did not terminate the exigency." *Id.* Furthermore, the Sixth Circuit decided that "the gathering of information by police, even in the face of immediate danger, does not negate a dangerous exigency."[10] *Id.* at 566. In addition, the

---

an easy task, and it points to our decision in *United States v. Good*, 780 F.2d at 775. But our decision here does not invariably require the government to have a telephone warrant before it moves in on a dangerous suspect. It simply requires the government either to attempt, in good faith, to secure a warrant or to present evidence explaining why a telephone warrant was unavailable or impractical.

810 F.2d at 883.

[9]Because the majority announces a new warrant requirement for armed standoffs when exigent circumstances clearly exist and continue until the end of the standoff, the officers would appear to be entitled to qualified immunity. *See Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 757 (1995) (noting that officers were not liable on qualified immunity grounds when a court declares an arrest unconstitutional for the first time).

[10]The Supreme Court has stated, "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do

Sixth Circuit in *Bing* analyzed the use of alternative means —
using pepper gas and a bag phone - for resolving the standoff
and found that they did not negate the exigency. *Id.* at 566-69.
Thus, *Bing* stands for the common-sense proposition that if
exigent circumstances exist at the beginning of an armed
standoff, that exigency continues throughout the standoff until
it is resolved.

The majority's attempt to infer through negative implica-
tion that the Sixth Circuit intended to micro-manage situations
by imposing a blow-by-blow exigent circumstances analysis
for every activity that is a part of an armed standoff stretches
*Bing* beyond its logical limits. The Sixth Circuit's own lan-
guage explains that:

> It cannot be that an immediate-danger exigency
> could have existed only when the police reasonably
> felt forced to raid the house. If this standard were
> generally applicable, any time the police methodi-
> cally increase the pressure on a barricaded gunman
> to force his exit, without invading, a rational juror
> may on that basis find no immediate danger. This
> position is not compelled by the Fourth Amendment.

*Id.* at 567. The Sixth Circuit recognized in *Bing* that the type
of step-by-step exigency analysis advocated by the majority
would lead to absurd consequences such as a finding that
there was no exigency unless the officers subjectively feel
compelled to forcibly raid a home. Officers must be allowed
to "methodically increase the pressure on a barricaded gun-
man to force his exit, without invading," because not only is

so would gravely endanger their lives or the lives of others." *Warden v.
Hayden*, 387 U.S. 294, 298-99 (1967). We have also recognized this prin-
ciple in the context of exigent circumstances. *See Ortiz-Sandoval v.
Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003) (concluding delay by police
for investigation did not negate exigent circumstances); *Bailey v. New-
land*, 263 F.3d 1022, 1033 (9th Cir. 2001) (same).

it reasonable, but gradual pressure, negotiations, and other tactics short of immediate invasion are likely to lead to a peaceful result such as the one in this case. *Id.*

The majority's decision cannot be squared with the Sixth Circuit's decision in *Bing* and thus, creates a clear circuit split on how to analyze exigent circumstances in an armed stand-off. If the Sixth Circuit can reasonably conclude that the exigency that created the need for officers to surround the home of an irrational, possibly intoxicated, armed gunman was not negated over the course of a five-hour standoff or the use of pepper gas and a bag phone, then why is it impossible for the jury in this case to reasonably reach the same conclusion?

The majority's reliance on the Sixth Circuit's decision in *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 993-94 (6th Cir. 1994), is also misplaced. First, the court in *O'Brien* held that there was no exigency to support the use of search probes. *Id.* at 997-98. Second, *O'Brien* concerned probable cause to search and seize the house, not probable cause to arrest.[11] *Id.* at 995. The majority confuses the issue presented of whether or not Fisher's arrest was excused by exigent circumstances with whether further intrusions could be deemed searches that might require a warrant. The result is an opinion that would essentially force officers to either get judicial approval of every tactical decision designed to bring a peaceful resolution to an armed standoff or to abandon an armed standoff.

D.   The wisdom of the jury should not be disturbed.

The twelve jurors in this case, however, saw this case dif-

---

[11]Indeed, Fisher only contests his seizure by the officers in his home; he did not contest any search-related issues. As such, any issues concerning searches are not before us and may not be decided. *See Steagald v. United States*, 451 U.S. 204, 212-13 (1981) (explaining differences between probable cause for arrest and probable cause to search).

ferently. They appear to have reasonably found that between the early morning hours and 2:35 p.m. the officers reasonably believed that Fisher still had access to guns, was still irrational, or was still intoxicated.[12] Nothing in the record negates the exigency created by Fisher when he had 18 loaded firearms, threatened others, pointed his rifle at police, was intoxicated, and acted irrationally. These circumstances provided the officers with ample grounds to be seriously concerned about their own safety as well as the safety of the public, particularly because the events took place in an apartment complex. Construing the evidence and the jury's verdict in the light most favorable to the City, as we are required to do, it cannot be said that the jury was unreasonable in concluding that there were exigent circumstances justifying the City's failure to obtain a warrant before arresting Fisher and that the exigent circumstances continued throughout the standoff.

## CONCLUSION

Armed standoffs are fluid and dangerous situations that are stressful, tense, and require difficult decisions to resolve peacefully. Not all of them result in the peaceful surrender of the suspect. *See Bing*, 456 F.3d at 562 (officer shot suspect); *Ewolski v. City of Brunswick*, 287 F.3d 492, 499-500 (6th Cir. 2002) (mentally disturbed, armed, and dangerous father shot his son and himself). At any time, a standoff can end peacefully, or it can explode into violence. Sometimes, hostages are involved. Armed standoffs always require difficult, complex, and stressful tactical decisions that attempt to balance the safety of all involved.

It is vital for the courts to provide clear guidelines to law enforcement that allow them to manage armed standoffs without the fear that, at some undetermined point, they will be

---

[12]The majority, not content to second-guess this jury, also speculates about what the jury in Fisher's criminal trial thought. (Maj. Op. at 15068-69.) Such speculation is improper.

subject to liability. Under the majority's decision, it is impossible to determine when the officers become liable. For example, if Mr. Fisher surrendered while officers were seeking a warrant, according to the majority opinion, the officers would be liable for failing to obtain an arrest warrant earlier. Is the cut-off point after an hour, ninety minutes, during the first phone call, when the suspect disappears from view for more than five minutes, if the suspect demands a pizza, or when there is a shift change? Armed standoffs present officers with a multitude of variables, situations, and often irrational acts by the suspect that require the exercise of reasoned judgment that the courts cannot, and should not, attempt to manage.

Imposing a requirement that officers must, at some arbitrary and undefined point in an armed standoff, seek an arrest warrant is contrary to our precedent holding that exigency is established at the time of arrest and continues until negated by some new act or fact. *See Lindsey*, 877 F.2d at 781-82 (concluding circumstances outside of the officers' control did not dissipate the exigency). Furthermore, imposing additional warrant requirements on the use of pepper gas, throw phones, and alternatives to deadly force would not serve the Fourth Amendment's purpose of preventing unreasonable searches and seizures. Instead, it will create unnecessary confusion and uncertainty about the law and may endanger the public, the police, and even the suspect.

The Supreme Court in *Tyler*, and our own court in *Echegoyen* recognized that once exigent circumstances justify an initial intrusion into the home, the officers are allowed to take all reasonable steps necessary to complete that intrusion without obtaining a warrant. Applying this simple principle to this case, officers are allowed to conduct a standoff and take steps to complete an initial warrantless arrest that is excused by exigent circumstances without obtaining a warrant. Because we consider a person arrested in his home once the police surround the home and confine a suspect to the home, and because that arrest is not complete until the officers obtain

physical custody of the suspect or the suspect submits to their authority, an armed standoff is simply a continuation of the initial arrest, and officers should be free to take all necessary steps to complete the arrest.

The jurors in this case determined that exigent circumstances justified the initial arrest and reached an eminently reasonable conclusion — that the San Jose Police Department should be commended for handling this dangerous situation properly and ultimately bringing about a peaceful resolution. The Sixth Circuit in *Bing* analyzed similar facts and reached the same conclusion as the jury in this case. Making all inferences in favor of the verdict, the jury's conclusion was supported by substantial evidence and was a reasonable interpretation of the facts. Accordingly, the district court should not have denied Fisher's motion for judgment notwithstanding the verdict.

For these reasons, I would reverse the district court's grant of Fisher's renewed motion for judgment as a matter of law and reinstate the jury's verdict.